**CHANGE THE CLIMATE, INC., Plaintiff,**

**v.**

**MASSACHUSETTS BAY TRANSPORTATION AUTHORITY, and Michael H. Mulhern, Acting General Manager of the MBTA, in his official capacity, Defendants.**

No. Civ.A. 00–10973–REK.

United States District Court, D. Massachusetts.

July 31, 2002.

Sarah Wunsch, Mass. Civil Liberties Union Fdn., Kimberly H. Scheckner, Harvey A. Schwartz, Rodgers, Powers & Schwartz, Boston, MA, for Plaintiff.

Joseph D. Steinfield, Julie E. Green, Brian S. Kaplan, Matthew S. Axelrod, Rebecca Hulse, Hill & Barlow, Boston, MA, for Defendants.

Robert H. Prince, Jr., General Manager of the MBTA in his official capacity, defendant.

128

## Opinion

KEETON, District Judge.

## TABLE OF CONTENTS

I. Introduction ...................................................129

II. Background Facts and Circumstances .................................130

III. Is "Public Forum" Law Applicable to the Distinctive Circumstances of
this Case? ....................................................131
 A. The State of Public Forum Law in the First Circuit ...................131
 B. Inapplicability of Forum Law to this Dispute ........................132

IV. Findings of Fact About the Sequence of Events Leading to Proposals for
Advertisements .................................................134
 A. Joseph White's Initial Contacts With Park Transit Displays ...........134
 B. Change the Climate is Incorporated and Receives 501(c)(3) Status.....134
 C. Change the Climate Submits Proposed Advertisements ................134

V. Some Key Characteristics of the Proposed Advertisements .................139
 A. In General .................................................139
 B. Findings that the Proposed Ads Target Minors and Promote
 Marijuana Use ...........................................143
 C. More on "Mixed Messages" ......................................145

VI. Key Findings about MBTA Guidelines ..................................146
 A. MBTA Guidelines Applicable in January of 2000 ......................146
 B. Lucy Shorter's Lack of Authority to Apply Guidelines .................152
 C. Insufficiency of Proof Regarding Viewpoint Discrimination by
 MBTA .................................................153
 D. More on the Excessive Discretion Given to Advertising Contractor.....153
 E. More on the Interim Guidelines and Defendants' Motion to Dismiss
 the Lawsuit .............................................153
 F. Defendants' Motion to Limit the Scope of Judgment ..................155
 G. Application of Guidelines to Other Advertisements ...................155
 H. More on the Relationship Between the MBTA and the Boston
 Public Schools ...........................................155

VII. Some Conclusions of Law ...........................................158
 A. Government as Proprietor ......................................158
 B. Role of Courts in Weighing Competing Claims of Right ...............158
 C. Madisonian Principles Require the Court to Consider the Public
 Interest .................................................159
 D. Public Interest is Distinct from Political Backdrop ...................159
 E. Taking Into Account the Public Interest .............................162
 F. Envisioning a Spectrum from Beautiful through Middling to Ugly.....162
 G. A Reasonableness Test for Advertising Guidelines ...................163
 H. Guidelines Must be as Concise as is Consistent with Clarity, and
 Free of Calculated Ambiguity .................................164

VIII. Enforcement of Guidelines and Transactions Beyond Law .................164

IX. Provisional Remedies ..............................................166

INTERLOCUTORY ORDER .................................................166

## I. Introduction

The Massachusetts Bay Transportation Authority ("MBTA" or "the T") is a sprawling transportation network of buses, subway lines, ferries, and commuter trains. It serves approximately 2.5 million people in Eastern Massachusetts. Its diverse ridership includes commuters who work in and around Boston, school children making the daily trip to and from the schoolhouse, and tourists enjoying the history, beauty, and distinctive attractions of the city. Many others use the T as a primary or secondary form of transportation.

Change the Climate, Inc., is a Massachusetts non-profit corporation that has, as a part of its formally declared objectives, a mission to reform the marijuana laws.

In this civil action, Change the Climate seeks recognition as a representative of the public interest as well as the interests formally declared as its objectives in its founding documents of incorporation. It asks the court to order the MBTA to publish three documents in the MBTA's advertising spaces, exactly as plaintiff says it proposed them.

The MBTA asks the court to rule that the proposed advertisements violate the guidelines governing use of its advertising spaces. The MBTA, also, claims to be the champion of the public interest, and asks the court to dismiss plaintiff's lawsuit with prejudice, forthwith.

For the reasons explained in this Opinion I find that the positions of both parties are too partisan to be in the public interest. So, too, are the positions of their attorneys.

On the record before me, I find it appropriate to declare that the MBTA's guidelines are constitutionally flawed but that Change the Climate has failed to meet its burden of showing a basis for an appropriate final resolution of this dispute. In these circumstances, I will require additional submissions by the parties and will hold additional hearings before ordering any final judgment in this case.

The issues I must resolve go well beyond those briefed by the parties. To resolve this case, I must decide questions that test the mettle of the American legal system to confront and resolve issues about authority and power in urban centers. These issues arise from the deeply conflicting influences of the evolving economic, political, social, and cultural forces that come to bear upon the authority and power exercised by entities, governmental and private, as well as natural persons living in or near the core urban areas of the United States.

Transportation in urban areas became increasingly expensive over the decades of the Twentieth Century, and the pace of increased expense quickened in the last two decades of the century. By the opening years of the Twenty-first Century, the economic and other costs, tangible and intangible, has become a major problem for all industries operating in the major urban areas of the United States. The problem has significant consequences also for their employees, for their customers, and for the governmental and private entities who have tried against the odds to save urban America from a fate even worse than envisioned by David Riesman in *The Lonely Crowd*. This reasonable effort, and the efforts of those associated with Riesman, were focused on understanding the evolving urban America of the late Eighteenth and Nineteenth Centuries. Urban area problems of the opening years of the Twenty-first Century are even more intractable.

Society has a vital interest in preserving urban America and protecting the rights of

its members to rebuild and enjoy homes and communities within America's cities.

These circumstances remind one of the words of the revered English poet, John Donne:

> Who casts not up his eye to the sun when it rises? But who takes off his eye from a comet when that breaks out? Who bends not his ear to any bell which upon any occasion rings? But who can remove it from that bell which is passing a piece of himself out of this world? No man is an island, entire of itself; every man is a piece of the continent, a part of the main.

John Donne, Meditation XVII, Devotions Upon Emergent Occasions (1624).

No man's claim of right can be plucked from its context and adjudged in the abstract. Rights as well as human beings come into conflict. It is the court's duty, as adjudicator of this case, to consider the rights of all of those who will be affected by the outcome of this case.

## II. Background Facts and Circumstances

Massachusetts law authorizes the MBTA "[t]o sell, lease or otherwise contract for advertising in or on [its] facilities." MASS. GEN.LAWS ch. 161A § 3(n) (2000). The MBTA displays commercial and public service advertisements on a variety of topics. When using one of the many forms of transportation provided by the T, a rider is exposed to these advertisements. These advertisements are a relatively important source of funding for the MBTA. Depending on the location of the ads, such as in transit cars or buses, riders may be exposed to them for long periods of time. If a transit car or bus is particularly crowded, the rider may not even be able to move away from a particular advertisement. Of course, one of the incentives for an advertiser to purchase space from the T is the

opportunity to expose a "captive audience" to its advertisements.

At issue in this case is the extent to which the T, or some other entity hired by the T, can control the manner of presenting ads in these advertising spaces and even the content of the ads.

The T has formulated guidelines that regulate its advertising spaces. The T permits both commercial and public service advertisements that satisfy these guidelines.

It has been the T's practice to hire a contractor to administer the use of the T's advertising spaces. The contractor's duties and practices have included receiving submissions of advertisements from customers and posting those advertisements, usually without showing them to representatives from the T. The T contends that proposed advertisements are supposed be shown to the T if the contractor finds that they may run afoul of the guidelines.

Change the Climate has proposed three advertisements for posting by the T. The three advertisements were created by Change the Climate's founder, Joseph White. As the court will explain, these advertisements were never formally submitted to the MBTA or its contractor for acceptance or rejection. It is Change the Climate's contention, however, that the ads were in fact rejected by an employee of the T. Although this opinion will examine material aspects of the somewhat convoluted process by which an ad is formally proposed for posting, I state at the outset that I find, for the reasons explained in this opinion, that beyond genuine dispute the T would reject the three proposed advertisements if formally submitted.

Change the Climate instituted this action on May 18, 2000, arguing that the T's rejection of the ads was based on their

content and viewpoint, and thus violated plaintiff's right to freedom of speech protected by the First and Fourteenth Amendments. *See* Docket No. 25, at ¶ 24. On July 31, 2001, the court denied both sides' motions for summary judgment because of "the existence of material and reasonably disputable mixed-law-fact-evaluative issues." *Change the Climate, Inc. v. Massachusetts Bay Transportation Authority*, 202 F.R.D. 43, 54 (D.Mass.2001). The court received evidence on the entire controversy during a three-day bench trial in February of 2002.

More recently, after the completion of the three-day trial, this case has been complicated by the T's submission of revised advertising guidelines, which they refer to as "Interim Guidelines." They are not sufficiently different from the previous guidelines to warrant any delay in resolving this matter. The T has stated that under the "Interim Guidelines" it would reject Change the Climate's proposed advertisements for basically the same reasons it would have rejected them under the previous guidelines.

The court now makes the findings of fact and rulings of law recited above and in the remainder of this Opinion.

## III. Is "Public Forum" Law Applicable to the Distinctive Circumstances of this Case?

### A. The State of Public Forum Law in the First Circuit

A threshold issue is whether MBTA stations and buses, and the interior of its subway cars, are a public forum. The issue is potentially material because the MBTA purports to act as an entity having governmental authority to restrict expression in its advertising space. The ability of such an entity to restrict expression in a public forum is, of course, more limited than its ability to do so in a nonpublic forum.

In this circuit, three principal types of forums have been recognized. *See New England Regional Council of Carpenters v. Kinton*, 284 F.3d 9, 20 (1st Cir.2002); *Jews for Jesus v. Massachusetts Bay Transportation Authority*, 984 F.2d 1319, 1323 (1st Cir.1993).

■ The first of these types is a forum characterized as traditional. Traditional public forums are places such as parks and streets that "have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Hague v. Committee for Industrial Organization*, 307 U.S. 496, 515, 59 S.Ct. 954, 83 L.Ed. 1423 (1939); *see also Perry Education Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37, 45, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983); *Kinton*, 284 F.3d at 20–21. In these traditional public forums, under the control of some agency of government, that agency must not ban all expressive activity. Indeed, a content-based restriction on expression in a traditional public forum is only permissible if it is narrowly tailored to promote a compelling state interest. Moreover, content-neutral restrictions of the time, place, and manner of expression must also ensure that sufficient alternative means of communication remain available. *See Perry Education Assn. v. Perry Local Educators' Assn.*, 460 U.S. at 45, 103 S.Ct. 948. In this type of forum, expressive activity is highly protected from government regulation.

A second type of forum recognized in this circuit is the designated public forum. This type of forum arises where the government has set aside an area for expressive activity that is not otherwise a traditional public forum.

■ Precedent declares that the government must explicitly intend to designate an area as a public forum before it is treated as such. *See Kinton,* 284 F.3d at 23. Of course, the concept of "governmental intent" is a figure of speech, and thus a form of legal jargon, because government is a legal entity and cannot in fact have the state of mind of intent. This figure of speech is a way of saying that the government is legally accountable for the intent of an officer or agent who has authority to act on its behalf.

In practice, the concept of a "designated public forum" is even more removed from a state-of-mind legal test because a court determines whether this figurative intent exists by analyzing the government's actions and the extent to which the government in fact opens up an area to expression. Thus the legal test is primarily an objective test rather than a state-of-mind test.

■ As long as an area remains a designated public forum, government restrictions on expression are assessed with the same scrutiny as in a traditional public forum. *See Perry* 460 U.S. at 46, 103 S.Ct. 948.

■ The third type of forum recognized in this circuit is the non-public forum. In a nonpublic forum the government may restrict expression "based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." *Cornelius v. NAACP Legal Defense & Ed. Fund,* 473 U.S. 788, 806, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985); *see also Perry,* 460 U.S. at 48–49, 103 S.Ct. 948. But a government agency "violates the First Amendment when it denies access to a speaker solely to suppress the point of view he [or she] espouses on an otherwise includible subject." *Cornelius,* 473 U.S. at

806, 105 S.Ct. 3439. A government agency has much greater authority to regulate expression in this type of forum. Content-based restrictions are permissible as long as they are viewpoint-neutral and reasonable in light of the purpose served by the forum. The Court of Appeals for the First Circuit recently held that the Fish Pier in Boston was a non-public forum because of limited public access and the government's manifested intent to use the space for a predominantly non-public purpose. *See Kinton,* 284 F.3d at 23.

## B. Inapplicability of Forum Law to this Dispute

■ The MBTA's buses, stations, and subway cars are not a traditional public forum. *See Lehman v. City of Shaker Heights,* 418 U.S. 298, 301–04, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974) (upholding the city's right to impose a blanket ban on political advertising on its buses). This conclusion is supported by the more recent decision of the Supreme Court in *International Society v. Lee,* 505 U.S. 672, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992), where the Court stated that a *traditional public forum* has the free exchange of ideas as a principal purpose. *Id.* at 679, 112 S.Ct. 2701.

Beyond genuine dispute, the MBTA's principal purpose is transportation. The principal purpose of the MBTA using some of this space for advertising is to earn revenue in support of the MBTA's goal of providing transportation. *See* Testimony of Michael Mulhern (Day 2, 143). Revenue from advertising space is critical because, without it, a public transportation system cannot survive the economic stress that changes in urban areas have placed upon public transportation. This perception of economic stress on urban transportation in America is so common that one need only be a regular reader of urban

newspapers and national news magazines to be aware of it. *See, e.g., Transit Troubles,* The Times–Picayune, July 1, 2002, *available at* 2002 WL 3106526; *Tunneling for Cash MBTA Eyes Plan to Let Firm Run Animated Ads on Transit System Walls,* The Boston Globe, June 5, 2002, *available at* 2002 WL 4131159; *CTA Faces Money Shortage; Route Cuts,* Public Opinion, May 29, 2002, *available at* 2002 WL 19835043; *Debate on Bus Shelter Ads Stops Board in its Tracks,* Chicago Daily Herald, February 8, 2002, *available at* 2002 WL 11770050; *C–Tran Ads Get Study, Revenue Plum Seen,* Portland Oregonian, April 3, 2000, *available at* 2000 WL 5390507.

■ In analyzing whether a place is a designated public forum, the court "look[s] to the policy and practice" of the governmental entity to determine whether that entity manifested an intent "to designate a place not traditionally open to assembly and debate as a public forum" and "examine[s] the nature of the property and its compatibility with expressive activity." *Cornelius,* 473 U.S. at 802, 105 S.Ct. 3439. "The decision to create a public forum" must be made by manifesting an intent to open "a nontraditional forum for public discourse." *Lee,* 505 U.S. at 680, 112 S.Ct. 2701 (internal quotation marks omitted).

As stated by the Court of Appeals for the First Circuit, the public forum doctrine has a "relatively murky status," and it has been difficult to place the MBTA advertising space squarely in the designated public forum or non-public forum category. *See AIDS Action Committee v. Massachusetts Bay Transportation Authority,* 42 F.3d 1, 9 (1st Cir.1994). The Court of Appeals has recognized that the written advertising regulations used by the MBTA may make its advertising space a non-public forum. *Id.* at 9–10. The Supreme Court's holding in *Lehman* also supports the principle that a transit authority can restrict advertising.

The evidence presented to the court in this case, however, makes it beyond genuine dispute that the MBTA has opened its advertising space to public service announcements as well as a wide range of commercial advertisements. If found to be a non-public forum despite its open advertising policies, a real danger exists that the MBTA, or its advertising contractor, will pick and choose among advertisements based on their controversial nature. Without far more relevant evidence at hand than has been produced by the parties in the 3–day trial of this case, the court could not adequately evaluate the decisions of others made in this way.

It appears to be equally inappropriate for the court to rule that the MBTA has created a designated public forum in its advertising space. The MBTA has openly and persistently enforced advertising Guidelines for many years. It would be unacceptable to make the MBTA's advertising space subject to the same standard as a public park, subjecting captive audiences of commuters, tourists, and schoolchildren to all sorts of graphic advertisements (which the court had the opportunity to view at trial) that could not be regulated for content. The court is unaware of any transit system in the world that currently adheres to a practice of making decisions in the way advocated by Change the Climate.

The court, in these circumstances, is faced with unacceptable proposals by the parties. Because none of the precedents concerning public forums is precisely on point, and for reasons more fully developed in the remainder of this Opinion, I do not decide the outcome of any controlling issue in this lawsuit on public forum grounds.

## IV. Findings of Fact About the Sequence of Events Leading to Proposals for Advertisements

### A. Joseph White's Initial Contacts With Park Transit Displays

Joseph White is the founder of Change the Climate. White first made contact with the T's advertising contractor, Park Transit Displays, in September of 1998. White's contact person at Park Transit was Elissa Albertelli, an account executive who handled the MBTA's advertising account. White made contact with Albertelli to discuss a proposed advertising campaign by Change the Climate. Albertelli sent White a cover letter and media kit soon after their conversation. *See* Exhibit 3.

Further discussions between White and Albertelli occurred by phone and at a meeting in Cambridge on May 10, 1999. The next day, Albertelli faxed White a cover letter and proposals for posting advertisements on the T. *See* Exhibit 4. The proposals included cost estimates. The letter stated that Albertelli was looking "forward to receiving [White's] creative executions to forward to the T."

In response to the letter, White faxed six example advertisements. *See* Exhibit 5. The court notes that two of these example advertisements have the same wording (although without the same pictures or website address) as ones at issue in this case.

### B. Change the Climate is Incorporated and Receives 501(c)(3) Status

During the remaining part of 1999, a number of events happened relevant to Change the Climate's corporate, financial, and tax status. On June 11, 1999, Change the Climate was incorporated in Massachusetts. *See* Articles of Organization, attached to Exhibit 7. White was also in the process of seeking 501(c)(3) tax exempt status from the IRS. This status was necessary to qualify for the T's 50% price reduction for public-service related advertisements. Change the Climate received 501(c)(3) status from the IRS on December 3, 1999. *Id.* Change the Climate also continued conducting fund raising during this time in preparation for its advertising campaign.

### C. Change the Climate Submits Proposed Advertisements

White had another conversation with Albertelli on January 3, 2000. A dispute exists among the parties as to whether a formal application was filed by Change the Climate following this conversation. White testified as follows:

Q. Okay. Now, so it's the end of 1999. You've got your corporation formed. You have your IRS letter with your nonprofit tax status. You have funding in hand, and you have ads in hand ready to go. What, if anything, did you do?

A. On January 3, 2000, I contacted Elissa Albertelli to follow up on her proposals for advertising on the MBTA.

Q. Okay, tell us, if you would, what your conversation with Elissa Albertelli on January 3, 2000, was.

A. I don't remember the exact words, but the conversation went something like, "Hello, Elissa. I'm ready to go. I have our 501(c)(3) tax-exempt status, and I have your proposals. Let's talk a little bit about which advertisements are going on which venue or which buses or which subways." And she responded by saying, "Great. Let's submit our formal application."

Q. Okay. And what did you understand a formal application to be?

A. Well, as I recall, she requested that I submit my IRS tax-exempt letter, a copy of that, our incorporation papers that we had filed and had approved by

the Secretary of State, and the three advertisements that we were intending to place on the MBTA.

Q. Okay, did you have any understanding as to whether there was any information that you had to submit in addition to what you've just told us?

A. No. She said that was the complete package.

Q. Okay, so what did you do?

A. So the next day I wrote her a letter and sent her the required packet for the advertising program.

Q. I'm showing you what we've marked as Exhibit 7. What is that?

A. This is the January 4, 2000 letter that I had sent to Elissa Albertelli, the cover letter outlining the materials that I needed for our application.

Q. And this was January 4?

A. Yes.

Q. And you say, "Thank you for taking the time with me yesterday to outline the steps we need to launch the Change the Climate ad campaign on the MBTA." By yesterday, are you referring to the telephone conversation?

A. Yes, I am.

Q. And attached to the first page— return to the second page, please. What is this document that says "Internal Revenue Service" in the left-hand corner?

A. This is a copy of our IRS tax-exempt status letter. It's the letter that you need to prove to people that you have been acknowledged by the federal government as an organization in good nonprofit standing.

Q. Now, what was your understanding of why the MBTA had any interest in your tax status?

A. As I understand it, the MBTA required you to prove your tax-exempt status in order to qualify for a reduced fee for one particular type of advertising.

Q. Which particular type was that?

A. The kind of ads that you get discounted as nonprofits are the ones that are inside the bus or inside the subway car as you look up above the seats.

Q. Okay. And what was the discount that you would get if you could show you were a not-for-profit corporation?

A. You got a 50 percent discount, as I recall.

Q. Okay. And were you seeking that discount?

A. Absolutely.

Q. Did you have to wait until you got that IRS letter before you got that discount?

A. Yes, and that was part of the process and why we submitted it within, you know, several weeks of our tax-exempt status recognition.

Q. Okay, now, after this IRS letter are some pages that say "Articles of Organization." What is that?

A. This is the Secretary of the Commonwealth's required articles of organization that we filed and that were approved.

Q. Okay. And turning to the first page of this letter, the first bullet is the 501(c)(3) letter. The second bullet is the Massachusetts incorporation papers. The third bullet says: "Copy for three ads we will use as part of the campaign. On each ad we've noted where we would like placement."

How did you note on the ads where you would like placement?

A. What I did was, I used Post–It notes and wrote the number of advertisements we were prepared to buy, given our $20,000 budget, on each particular ad and where those ads would be

placed, whether they would be on the outside of the bus, whether they would be in a subway station, or whether they would be on the inside of a bus or a car. Those are three different kinds.

Q. Did you make any photocopies of the Post–It notes?

A. I didn't because they are Post–It notes.

Q. Okay. And in addition to the IRS letter and the corporation papers, you say you enclosed three ads. Did you enclose three ads?

A. Yes, I did.

Q. Okay, I'm showing you what we've marked as Exhibits 8–A, B, and C. What is that?

A. These are the three advertisements that we submitted to the MBTA for our campaign.

Q. And on each of these advertisements, was there a Post–It note?

A. Yes.

Q. Okay, do you remember as to each of these where you wanted them posted?

A. Yes.

(Day 1, 51–55).

On cross examination, White provided the following testimony:

Q. Before January of 2000, you hadn't received any message from anyone at the T or at Park Transit Displays to indicate that the MBTA would not post some ad proposed by Change the Climate?

A. There was no reason for me to receive any information because we hadn't filed our formal application until January 4, as requested by Elissa Albertelli.

Q. Mr. White, I think I'm asking you a pretty straightforward question. You had received no indication before January, 2000, that the MBTA would not run

an ad for your organization; is that correct?

A. Uhm, yes, but there was no reason for them to because we hadn't formally asked them to.

Q. Now, when you sent Elissa Albertelli a copy of your IRS 501(c)(3) tax-exempt letter and your incorporation papers in January of 2000—and that's Exhibit 7—let me put it in front of you—when you sent Ms. Albertelli that letter, you said you were "optimistic about our success." Is that right?

A. That's what I wrote.

Q. You had some doubt about whether the T would approve your ads?

A. I don't know if I had any doubt as much as the fact that I had to submit creative for them to sort of look at and consider. But like I had said previously in my testimony, she did not think that the ads were, you know, radical or out of sight in any means, so I continued to be optimistic, yes.

Q. You knew from your conversations with Elissa Albertelli that the T doesn't run every ad that is submitted to it?

A. I don't know if she actually used those words, but, I mean, I don't know if I thought that. I don't even know if it came up in our conversation. It seems like they run most of the ads. That was my impression.

Q. But in fact you knew that if you had to run your creative by the MBTA, that they don't run every ad that is submitted to them?

A. I'm sorry, I didn't really get that sense from Elissa as much as this was her doing her due diligence in her role to acknowledge that these were on a public policy issue that might be of some concern to her boss at the MBTA, and so she said, "This is what I'd like to do," and I thought that was fine.

Q. And when you say you're optimistic about your sense, were you entertaining the notion that maybe the T would reject your ads?

A. I was hopeful that we would start a campaign as soon as possible.

Q. Now, ultimately you received a fax back from Elissa Albertelli; is that correct?

A. I'm sorry, would you repeat the question?

Q. You received a fax back from Elissa Albertelli after sending the January 4, 2000 materials; isn't that right?

A. Yes. I think it was a few weeks later.

Q. And that was the fax that enclosed the fax from Lucy Shorter to Elissa Albertelli?

A. Are you referring to the one that sort of denied our application?

Q. I'm referring to Exhibit 9.

A. Oh, okay, yes.

Q. After you received Exhibit 9, you didn't call Lucy Shorter directly?

A. No. That would have been the wrong thing to do, since Lucy Shorter had told me in May of 1999 that I was not to call her and that I was only to deal with Elissa Albertelli because that's who the MBTA had their contract with to manage the advertising.

Q. So you had spoken with Lucy Shorter six months earlier before you had put together what you believed to be a completed application, and she had told you to work with Park Transit Displays; is that right?

A. Yes.

Q. And then you put together what you thought was a completed application; is that right?

A. I was told it was a complete application.

Q. You believed it was a complete application?

A. I believed and I was told it was a complete application.

Q. And then you got a response back that indicated to you that the MBTA was not going to accept your proposal?

A. Yes.

Q. And you spoke with Elissa Albertelli after that, you say?

A. Yes.

Q. And didn't she tell you, "Why don't you call Lucy Shorter"?

A. I don't believe she said that at all.

Q. Hadn't Elissa Albertelli in fact told you that the people who make decisions about the content of ads and whether they fall within the appearance and character guidelines is the MBTA, that it's the MBTA that makes those decisions, not Park Transit?

A. I think I was aware that the MBTA maybe had the final say, but she never mentioned anything about policies or guidelines.

Q. But you made no attempt to contact the MBTA, after you got what you considered to be a denial of your application, to say, "Why did you deny me?"

A. I did not contact the MBTA, no.

Q. You didn't propose to them putting a disclaimer on your ads like you put on your Washington ads?

A. No. That was never presented to me as a possibility.

Q. And you didn't propose to the MBTA running other ads by them, did you?

A. I took this as a complete declination, and I believe that Elissa Albertelli made that clear to me.

Q. And you didn't go to the MBTA and say, "I'd like to understand exactly what

your reasons are for declining these ads"?

A. No, I did not go directly to the MBTA.

Q. You didn't go to the MBTA or Lucy Shorter and say, "You got it wrong when you described what we do in that fax"?

A. No, I'm sorry, I did not go to that because she had told me previously that I was not to contact her directly.

(Day 1, 115–19).

The court heard testimony from Lucy Shorter on her recollection of the MBTA's relationship with White and the instructions that she gave to Albertelli regarding Change the Climate's proposal:

Q. Now, in 1999, was there a person at Park Transit you normally dealt with?

A. I dealt with the entire staff.

Q. Who is Elissa Albertelli?

A. She's one of the sales representatives.

Q. Okay, were there several sales representatives?

A. Yes.

Q. But Elissa Albertelli was a sales representative, one of the sales representatives at Park Transit you dealt with on behalf of the MBTA?

A. Yes.

Q. Now, at some point did you have a telephone conversation with Elissa Albertelli in which she said that she would be sending you some ads to have a look at from Change the Climate?

A. Yes.

Q. What do you recall of that conversation? What do you recall her telling you?

A. She had some ads that she was going to send over to me, and she wanted to know, what did I think?

Q. Okay, what was your understanding as to what she meant by, what did you think?

A. What was the opinion of these ads?

Q. As to whether or not they complied with the guidelines?

A. Correct.

Q. Okay, I'm showing you what we've marked as Exhibits 8–A, B, and C. Would you have a look at them, please? (Witness examining documents.)

Q. Are those copies of the ads that Elissa Albertelli sent to you and asked for you to review to see whether they complied with the MBTA's guidelines?

A. Yes.

Q. Okay. And what did you do when you received these ads?

A. I looked at them, and I sent them back with the '99 bid specs that had been prepared and were ready to be released.

Q. Okay. Now, you understood that she wanted to hear from you whether or not the MBTA would agree to post those ads; is that correct?

A. She really didn't give me that impression. She sent them in to me and asked me, what did I think about them? There was no mention of a contract or the value or the fact that they were going to be posted. It was just a "What do you think?"

(Day 2, 80–81).

Unfortunately, Albertelli was not called to testify by either side as to her recollection of White's proposal in January of 2000. The court heard testimony from a previous General Manager of the MBTA, Robert Prince, as well as the current Acting General Manager, Michael Mulhern, that explained the process by which an advertisement is reviewed by the MBTA under the applicable advertising guide-

lines. This process is described later in this Opinion, as it bears on other issues.

For now, it is sufficient to note that a formal proposal was never sent to Lucy Shorter by Elissa Albertelli or Joseph White, and the advertisements at issue in this case were never reviewed by the proper decision-makers at the MBTA. It is the court's decision that Shorter did not intend that her communication with Albertelli be a final decision.

In form the communication given to White was a hastily handwritten fax. The court concludes that White has not provided sufficient evidence to support a finding of a firm rejection by the MBTA. *See* Exhibits 9 and 10. Moreover, it is beyond genuine dispute that White never followed up with Park Transit or the MBTA regarding how he could make his advertisements compliant with the MBTA's advertising guidelines. He also never requested a formal decision by the MBTA after he received from Albertelli a copy of the Shorter fax.

I find, nevertheless, on the basis of the testimony of Prince and Mulhern, that the MBTA would have rejected White's proposed advertisements if they had been properly submitted. I find also that White now wants the particular advertisements he submitted in January of 2000 to be posted by the MBTA without revision. In these circumstances, I move on to consider the advertisements that White submitted to Albertelli in January of 2000.

## V. Some Key Characteristics of the Proposed Advertisements

### A. In General

The three advertisements that were a principal focus of the evidence offered at the three-day trial were included in Change the Climate's January 3, 2000 submission to Albertelli. Color copies of these proposed advertisements were re-

ceived in evidence. *See* Exhibits 8A, 8B, and 8C.

Exhibit 8A displays a young female and states, "Tell us the truth ... Smoking pot is not cool, but we're not stupid, ya know. Marijuana is *NOT* cocaine or heroine." A dispute at trial arose over whether the word "us" was underlined in the advertisement submitted to the T. Change the Climate could not prove that "us" was underlined, and the parties agreed to submit a copy of the advertisement where "us" was not underlined. (Day 1, 63–65).

Exhibit 8B displays a woman who appears to have just finished writing a message on a board and states, "I've got three great kids. I love them more than anything. I don't want them to smoke pot. But I know jail is more dangerous than smoking pot."

Exhibit 8C displays two police officers standing back to back in front of an American flag. The advertisement states, "Police are too important ... too valuable ... too good ... To waste on arresting people for marijuana when *real* criminals are on the loose."

All three of the proposed advertisements list Change the Climate's e-mail address, "www.changetheclimate.org" in the bottom right hand corner.

The court heard testimony from each witness as to the meanings each took from these advertisements, especially as to (1) whether they targeted children, and (2) whether they promoted marijuana use. None of the witnesses had formal training in advertising or was offered as an expert.

Joseph White testified as to his intentions in drafting these advertisements:

Q. Okay, I'm showing you what we've marked as Exhibits 8–A, B, and C. What is that?

A. These are the three advertisements that we submitted to the MBTA for our campaign.

Q. And on each of these advertisements, was there a Post–It note?

A. Yes.

Q. Okay, do you remember as to each of these where you wanted them posted?

A. Yes.

Q. Okay, let's go to 8–A. That's the one with the picture of the girl on it.

A. The young woman with the hat on?

Q. Yes, yes.

A. Okay.

Q. Where did you want that one posted?

A. I believe we wanted those posted on the inside of the buses, the poster cards.

Q. Okay, so this was the one you wanted for the 50 percent discount?

A. Yes.

Q. Okay. And 8–B, the one with the picture of the woman on it, where did you want that one posted?

A. I believe that these were going to be in subway stations in the MBTA.

Q. Okay. And 8–C, the one with the police officers, where did you want that posted?

A. Those were going to be on the outside of buses.

Q. Now, what was the total dollar amount of what you were proposing to spend with the MBTA?

A. Approximately $20,000.

Q. Okay. Now, I'd like to look at each of the individual ads.

．　　　．　　　．　　　．　　　．

Q. All right, let's start with 8–C, the one with the police officers. You created this?

A. Yes.

Q. And you selected that photo?

A. Yes.

Q. Was there some message you were intending to send with this?

A. Yes.

Q. What was the message?

A. Well, the message we were trying to send was to taxpayers, and we were trying to raise questions in their minds—and it's probably become more poignant after September 11—that police are really valuable to our society and we should be taking care about how we use this valuable resource. And I wanted people to come away with a question about, "Gee, should we be spending more of police time and efforts on dealing with violence and dangerous crimes and maybe not on arresting people who are smoking marijuana?"

Q. Is that the message that you intended that people would take away from this ad?

A. Well, I can't speculate on what message that people would be having on their own, but the interest of Change the Climate was to provoke thinking and provoke thought and stimulate debate about these issues.

Q. Why did you select this photograph?

A. Well, I think it's an excellent photograph, and I think it grabs people's attention.

Q. Is that what you were trying to do?

A. Yes.

Q. And this was going to go on the outside of buses?

A. Yes.

Q. Was this ad or one very similar to it ever printed up in large bus-size form?

A. Yes.

Q. And why was that done?

A. Well, that was done because we needed to print up 50 of them to put on

the outside of buses in Washington, D.C., our nation's capital.

Q. And were they posted on buses in Washington, D.C.?

A. Yes, they were.

Q. We just happen to have, if I can display, your Honor—what is this?

A. Technically, that is a queen-size bus poster.

Q. And did this run on the outside of buses in Washington, D.C.?

A. Yes.

Q. How many buses?

A. Fifty buses.

Q. For what period of time?

A. From January 1, 2001, until January 31, 2001, as far as I know.

Q. Is this an actual poster that came off of a bus?

A. Well, actually, when you print these posters, you get several copies for your own use. And they actually come in three different sections, so that's why it's kind of wrinkled. I had to put them together.

Q. Okay, let's put it away. Was it your intention with this ad that children would get the message that they should smoke marijuana because police won't arrest them?

A. No.

Q. Okay, let's turn to 8–B, the one with the woman on it. What was the message you were intending to send with this ad?

A. We were looking to raise questions in parents' minds about the frightful possibility that any of their children could end up in a dangerous jail as a result of marijuana experimentation.

Q. Now, this ad reads, "I've got three great kids. I love them more than anything. I don't want them to smoke pot. But I know jail is a lot more dangerous

than smoking pot." Why did you put in this ad the words "I don't want them to smoke pot"?

A. Well, because our advertising is trying to get the message across that, as responsible parents, we don't want our kids to smoke pot.

Q. Now, were you really intending to send a message when you say "I don't want them to smoke pot" that you do want them to smoke pot?

A. No.

Q. Why did you choose this photo?

A. Why did I choose this photo?

Q. Yes.

A. I chose this photo because it's a picture of a woman who I had hoped parents or mothers would identify with as a mother. And also I believe she is a businesswoman. So those were two of our groups that we were trying to communicate to.

Q. Now, in the lower right-hand corner you've got the "www.changetheclimate.org." Why did you include that?

A. When you do advertising, you want somebody to take an action, and the action we wanted people to take was to go to our Web site to learn more about Change the Climate, to become better educated about the importance of this issue and how it impacts their life as a parent or as a taxpayer or as a citizen.

Q. Let's go to the third ad, 8–A, the one with the young woman in it. Why did you select that photo?

A. Well, I selected the photo because I think it was—I think it's in the same way that the other photos would draw people's attention.

Q. Why did you think this photo would draw people's attention?

A. Well, because I think it represents to me as a parent, perhaps other parents, what kids look like today.

Q. Okay. And what scenario are you trying to represent in this ad? What's supposed to be happening here? I'm sorry.

A. Oh, well, you know, you have a picture of a young person who could be, you know, in my mind, any of the girls who are over at our house, you know, visiting any of my sons. And it kind of represents, to me, what kids look like today.

Q. Okay. And what is this girl supposed to be doing in this ad?

A. Well, she's just standing there and—I'm not sure I fully understand your question.

Q. Who is she addressing?

A. Oh, she's really talking to adults or to parents.

Q. Okay. And where is that indicated in the ad?

A. Well, it's indicated by the whole statement, but in particular it's talking—the line "Tell us the truth," it's—

Q. Why is "us" underlined?

A. Well, because it's saying, "We're your kids. You need to tell us the truth. We want you to be honest with us."

Q. And why did you think that was an important message?

A. Well, because I think that honesty between kids and their parents is fundamentally important if you hope to be able to help them through the tumultuous years of adolescence into adulthood.

Q. Did you have any beliefs about whether other advertising concerning marijuana was honest with kids?

A. Well, certainly, especially from conversations that I've had with my own children, in particular my now 20–year-old, who raised the issue to me for the first time when he said, "Why do adults lie to kids about marijuana?" And so perhaps in some way this was—this was in recognition of that—of that important conversation I had.

Q. Now, the ad says "Marijuana is Not," capital, underlined, "cocaine or heroin." Why did you say that?

A. Well, because I think that in the understandable effort that the government and other groups may have to keep children from experimenting, they have put marijuana in the same category as cocaine and heroin, and kids know that's not the truth.

Q. Do you believe that marijuana should be in a different category than cocaine and heroin?

A. Well, I think I do. But, again, I think most sociologists and medical authorities would agree with that as well.

Q. So what was the purpose of this ad?

A. The purpose of this ad was to reach parents with the message saying, "We need to be honest. Our children are dying for us to be honest with them about this issue."

Q. Now, you have this young woman saying, "Smoking pot is not cool." Why did you include that?

A. The message we're trying to deliver is that smoking marijuana is not cool for kids, it's not okay. And that's what the words say.

Q. Now, where you say "Smoking pot is not cool," were you really trying to say the message "Smoking pot is okay, kids"?

A. No.

(Day 1, 55–59).

On cross examination, White provided further testimony regarding the advertisements at issue:

Q. I want to call your attention to what we've called the teen advertisement, which is Exhibit No. 8–A. What in that

ad, sir, makes it unequivocal that marijuana use is not for kids?

A. I think the statement "Smoking pot is not cool" is a statement that stands on its own in what it communicates to kids, or anybody else, for that matter.

Q. Do you think the statement "Smoking pot is not cool" is unequivocal about saying that marijuana use is harmful to kids?

A. I'm sorry, could you repeat your question?

Q. Sure. The statement "Smoking pot is not cool," in your view, is that unequivocal in conveying the message that marijuana use is not for kids?

A. It's pretty clear, yes.

Q. Just saying that it's not cool?

A. Yes.

Q. And in this ad showing a mother—is it fair to say, by the way, that somebody looking at that ad quickly would possibly understand that to be a teacher as well as a mother?

A. I can't speculate what somebody would think. The fact that the words "Product launch" are on the bulletin board made it clear to me that she was actually a corporate executive. And I don't know if she's a mother, but that is what I had hoped that people would take from it.

Q. But you don't know what people actually do take from it?

A. I can't speculate on that, no.

Q. What in that ad, which is Exhibit 8–B, makes it clear that smoking pot is not for kids?

A. I think the statement by the person in the picture, who some people would take to be a business executive and/or a parent, when they say the words, "I don't want them to smoke pot," would reinforce the fact that most responsible parents would not want their kids to smoke pot.

Q. So when it says, "I don't want them to smoke pot. But I know jail is a lot more dangerous than smoking pot," in your view, that sends unequivocally the message that smoking pot is not for kids?

A. Yes.

Q. It doesn't sound to you kind of like, "I want them to eat their green beans, but I'm going to have bigger things to fight about"?

A. No.

Q. In your view, is the character you've portrayed in that ad simply resigned to the fact that kids are going to smoke pot?

A. I don't know. I mean, it's widely understood that 50 percent of teenagers try pot at some point, and so I think that's just part of the reality.

Q. And isn't it possible that some kids riding the MBTA, if they were to see that ad, would take from it that "I guess it's no big deal if I smoke pot"?

A. I just—I could not speculate on what a kid would be thinking. I would hope that they would think, "Jeez, you know, that sounds like my mother. She doesn't want me to smoke pot."

Q. But you can't speculate on that?

A. Right.

Q. You just don't know one way or the other?

A. No.

(Day 1, 125–27).

## B. Findings that the Proposed Ads Target Minors and Promote Marijuana Use

Before moving on to discuss the MBTA's reasons for rejecting the advertisements, the court finds it appropriate to comment on the above testimony by Joseph White.

The MBTA contends that White's testimony is not credible when he states that the advertisements at issue do not target children and do not promote marijuana use.

Change the Climate responds that the meaning of the advertisements, like beauty, is in the eye of the beholder.

This effort to show that no proposed advertisement can properly be found by the court to carry a false message is not persuasive. If the overworked and often misused explanation invoking "the eye of the beholder" contains some element of truth, it is not the whole truth and for that reason is misleading. Some things are demonstrably true or false.

The times do change,

And so do you.

Your shoes are worn,

But once were new.

In Exhibit 8A, the picture is of a minor and the words are spoken from the perspective of a minor. The statement, "Tell us the truth" emphasizes that minors are the ones doing the speaking in this advertisement. Although the court recognizes that parents are also an intended target of this advertisement, it is beyond genuine dispute that this advertisement targets minors. This much is demonstrably true.

This advertisement is also a classic example of a mixed message. Even though it states that smoking marijuana is not cool, it differentiates marijuana from cocaine and heroin without explaining why they are different. It is the court's finding that the advertisement is stating that it is less bad to use marijuana than cocaine or heroin. This sends a mixed message about unlawful conduct since it is beyond genuine dispute that all three drugs are regulated by law. The advertisement does not at any place say what marijuana laws provide or state that they should be changed.

Exhibit 8B is targeted at both adults and children. The woman in the advertisement appears at first glance to be a teacher. The words on the board indicate upon close inspection, however, that she may be a businesswoman. Nevertheless, beyond genuine dispute the text of the advertisement indicates she is a mother of three children and thus, even if the court ignores her resemblance to a teacher, the advertisement is one where an authority figure in children's lives is speaking. The woman is talking about her kids and makes the statement that "jail is a lot more dangerous than smoking pot." It is the court's finding that minors will read this advertisement and receive the message from an authority figure that jail is more dangerous than smoking pot. That message is likely to be confusing and misleading to minors because in fact one consequence of smoking pot may be confinement in jail. Moreover, it has been plaintiff's position in this civil action that it is not appropriate for minors to smoke pot. Even though no evidence has been offered by either party on the dangers of smoking pot, it is beyond genuine dispute that this advertisement, like Exhibit 8A, attempts to make a comparison between the harms of smoking pot and jail. Again, this is a message likely to be confusing and misleading to minors.

It is the court's finding that Exhibit 8C does not target minors in the direct manner of Exhibits 8A and 8B. Of the three advertisements, nevertheless, it is the most egregious in providing a misleading message regarding the legality of marijuana use. The statement that marijuana users are not "real criminals" is simply incorrect because it states a broad proposition that, unqualified by more explanation, is not true!

## C. More on "Mixed Messages"

The court finds key elements of the testimony of Cornelia Kelly, headmaster of Boston Latin, to be persuasive on the matter of "mixed messages" to children.

Q. This ad says: "Smoking pot is not cool." Why is it that you think your students will take from this message that marijuana is okay?

A. If you look at that ad, that's a real mixed message to young people. And the students with whom I deal get a great deal of stimulation in different ways. And what you're looking at there is not a clear-cut message. And when children—I hate to use the term, but when children are that age, we try and see to it that they understand clearly what's legal and what's not legal. And that really says marijuana is not cocaine or heroin. It takes marijuana out of the realm of cocaine and heroin, where we consistently tell young people that marijuana is an illegal drug and you will be expelled for it or you will be arrested for it, or you will be—you'll lose your place in college or you'll lose your financial aid.

Q. Headmaster Kelley, you've worked with teenagers for 30 years. You've got 2,400 students at your school. Is there anything about this ad that makes you think that students will notice it if it was displayed on the T?

. . . . .

A. The thing that strikes me about that ad is that—and I don't know—this is—it reminds me of a Britney Spears kind of situation, and young people really key on rock stars and celebrities that seem to connote that illegal drug use is okay.

. . . . .

Q. So what is the problem with this ad?

A. There is a message there. There's a mixed message to young people that marijuana is not as bad as cocaine or heroin. And they are all illegal.

(Day 2, 31–32, 34).

Q. I'd like to show you now another of the ads that plaintiff seeks to require the T to display on MBTA buses and trains. This is a blowup of what's been marked as Exhibit 8–B. Would you be concerned if this ad were displayed on the MBTA trains and buses that take Boston Latin students to and from school?

. . . . .

A. I would be very concerned about that one because, to my mind, that looks like a teacher at a board. I wouldn't want to see that at all.

Q. And why is that?

A. There is a message there also that—there's another mixed message there. That's the problem with that. There's a message there that jail is a lot more dangerous than smoking pot. Smoking pot is illegal. Jail is where you end up if you are arrested for that.

Q. And so you'd be concerned if your students saw this on the T?

A. I would be because it looks like a teacher talking about it.

Q. Do you think this ad sends the message that smoking marijuana is okay in any way?

A. Yes, I think it does send that message.

Q. How so?

A. It says: "I don't want them to smoke pot." And yet it goes on to say that jail is a lot more dangerous than smoking pot. Smoking pot is illegal.

That's the bottom line. And we give clear messages to young people (Day 2, 34–35).

Q. I want to show you now a third ad that the plaintiff seeks to require the MBTA to display on trains and buses, and the same question about this ad: Would you be concerned if this ad were displayed on MBTA trains and buses that take Boston Latin students to and from school?

A. I would be very concerned about that one. That one conveys that the police countenance the use of marijuana.

Q. How does it do that?

A. That real criminals—that arresting people for marijuana when real criminals are on the loose—I mean, police have rules and regulations or laws that they must enforce. That conveys the idea that you won't get arrested for marijuana. To my mind, that's another mixed message to young people.

Q. If this ad were displayed on MBTA buses or trains, do you think your students would notice it?

A. Do I think they would notice it? Most certainly they would notice it.

Q. Why is that?

A. It's very visual, and it links marijuana with the police department.

(Day 2, 35–36).

This Opinion will return to this issue in greater depth in Part VI.H. when considering the Boston School District's use of the T for student transportation to and from school.

## VI. Key Findings about MBTA Guidelines

### A. MBTA Guidelines Applicable in January of 2000

Robert Prince testified as follows regarding the applicable advertising guidelines in January of 2000.

Q. I'm showing you Exhibit 14. We have been calling this the "Mabardy letter." Is that what you're referring to?

A. Yes, sir, that's what I'm referring to.

Q. Okay. And did that become the policy of the MBTA in regard to advertising, appearance of advertising?

A. It became part of the policy, yes, sir.

Okay. And what was the rest of the policy?

A. The rest were under the guidelines of the existing agreement. This was an add to that. In 1995 we put on an add and specified areas regarding children.

Q. Okay, so in 1995, Mr. Mabardy's letter was in addition to what was shown in Article VII in the '92 bid specs, Exhibit 11?

A. I believe so.

Q. I'll leave these in front of you then. And in fact who is Mr. Mabardy's letter to?

A. Michael Geden, Vice President/General Manager of Park Transit Displays, Incorporated.

Q. And the purpose of Mr. Mabardy's letter is to notify Park Transit that the MBTA's advertising guidelines have changed; is that correct?

A. I believe so, yes.

(Day 3, 11–12).

Prince testified to the 1999 bid specifications as follows:

Q. Okay. And the 1999 bid specifications were incorporated in that July, 2000 contract with TDI [contractor that replaced Park Transit], correct?

A. Yes, sir.

Q. Now, before the contract with TDI, Mr. Mabardy's letter was in effect, correct?

A. Yes.

Q. And the guidelines in those 1999 bid specifications became the specifications for the MBTA when the contract with TDI was signed, correct?

A. No, sir.

Q. Okay, this is Page 14. Directing your attention to Page 14 of your deposition—do you recall coming to my office for a deposition?

A. Yes.

Q. And I asked you questions, you answered them, you were under oath?

A. Yes.

Q. Okay, I'm showing you on Page 14—I'm sorry, do you need more time to go through this?

A. I want to—

Q. Okay, go ahead. I don't want to rush you. (Witness examining document.)

A. Okay.

Q. Okay. And on Page 14, I asked you, "When did the guidelines become the specifications for the T?" And how did you answer?

MR. KAPLAN: Objection. There is an intervening objection between the question and the answer in this deposition to clarify that what was being asked about is Article VII in the actual bid specs.

MR. SCHWARTZ: Okay.

Q. "When did the guidelines contained in Article VII of the '99 bid specs become the specifications for the T?" And what did you answer?

A. "When the contract was signed."

Q. When the contract was signed. When was the contract signed?

A. July of 2000.

Q. Okay. And you were also asked, "Before the contract with TDI went into effect, what document stated the T's pol-icy in regard to advertising?" And what did you answer?

A. "The Mabardy letter."

Q. The Mabardy letter. And you're not aware of any document, are you, that shows that the 1999 bid specifications went into effect before the TDI contract went into effect, are you?

A. I'm not aware of any document. I'm aware of the fact that when we worked on the specification changes, that they went into effect almost immediately as we changed our policy, yes.

Q. Okay. But you're not aware of any document that shows that, are you?

A. No, sir.

Q. And in fact you're not aware of any document that informed Park Transit Displays that the advertising guidelines had changed, are you?

A. A document, no.

Q. And there's no document like Mr. Mabardy's letter from the General Manager to Park Transit saying, "Park Transit, we've changed our advertising guidelines. Here are the new guidelines"? No document like that, is there?

A. No document, no.

(Day 3, 14–16).

Michael Mulhern provided further testimony regarding the history and applicability of the MBTA's advertising guidelines. His memory as to the history of the guidelines was much clearer than that of Robert Prince. Mulhern is also the current Acting General Manager of the MBTA so his perspective as to the more recent guidelines is relevant. He testified as follows:

Q. Okay, now, I'm presenting you in Exhibit 16 Article VII, "The Appearance and Character of Advertisements." Does that contain the present policy of the MBTA regarding the appearance and character of advertising?

(Witness examining document.)

A. This is the key element that the director of marketing uses to determine whether or not a piece of advertising should run, and that's also supplemented with some guidelines that were issued by a prior General Manager back in 1995.

Q. We have been referring to that as the Mabardy letter. Is that what you're referring to?

A. Yes. Yes, sir.

Q. Now, in the guidelines that are presently in effect, it refers to promotional material that is harmful to children. Do you see that?

A. That is harmful to juveniles, yes.

Q. Okay. Is there any definition in the MBTA's advertising guidelines for what it means to be harmful to juveniles?

A. The Mabardy letter I believe refers to something that might not only be harmful but frightening to children as well. But beyond this provision and the Mabardy memorandum, I do not believe that there are any other definitions.

Q. Well, how do you go about determining whether something is harmful to juveniles, that proposed advertising is harmful to juveniles?

A. That would be an issue that would need to be vetted on the basis of these provisions with the director of marketing, the AGM administration, the general counsel, and the General Manager.

Q. What do you mean by "vetted"?

A. Discussed.

Q. And you're the one who makes the ultimate decision?

A. Only to reject an ad.

Q. Okay. And how would you make the determination whether a proposed ad is harmful to children, harmful to juveniles?

A. I would try to determine the message, whether or not that message was directed at juveniles, and determine if the message was attempting to denigrate juveniles in any way, or possibly even promote an illegal activity amongst juveniles.

(Day 2, 116–17).

A dispute exists as to which advertising guidelines were in effect at the time White's advertisements were submitted to Albertelli.

Based on a review of the relevant Exhibits, as well as the testimony provided in court, I make the following findings regarding the advertisements.

A document was entered into evidence (Exhibit 11) entitled "Massachusetts Bay Transportation Authority Specifications for Transit Advertising," and dated August 26, 1992. Article VII of this document is entitled, "Appearance and Character of Advertisements." That document contains the advertising guidelines. These guidelines were a part of the contract between the MBTA and Park Transit and were the only applicable advertising guidelines from the date of the contract's adoption in 1992 through April 21, 1995.

Article VII of the 1992 Bid Specifications states:

All advertisements at any time inserted or placed by the Contractor in or upon any locations or display devices shall be of a reputable character, and the appearance of all advertisements shall be acceptable to and in accordance with the Massachusetts Bay Transportation Authority's Standards for Character and Appearance of Advertisements. No libelous, slanderous, or obscene advertisements, may be accepted by the Contractor for display in or upon the Authority's transit facilities. Advertisements shall be submitted in advance to the Authority for review at the Authority's request or whenever the Contractor reasonably

believes such advertisements may be objectionable within the meaning of this ARTICLE.

Any advertisements determined by the Authority to be objectionable within the meaning of this ARTICLE shall be removed by the Contractor within 24 hours of notification of such determination. If the Contractor shall fail to do so, the Authority, at the Contractor's expense, may forthwith remove the same without liability for such removal.

The Authority shall be liable for actual costs and expenses, incurred by the Contractor for ordering the removal of any advertisement which the Authority has reviewed prior to placement, in accordance with the provisions of this article.

The Authority reserves the right to request review of any and all advertisements.

Exhibit 11 at 12–13.

The court also notes that Article VIII of the 1992 bid specifications prohibits the advertisement of tobacco products. *See* Exhibit 11 at 17.

Two documents, apparently drafted in 1993, have been entered into evidence and are apparently an effort by the MBTA's Board of Directors to formulate advertising guidelines for commercial and public service advertising on the T. *See* Exhibits 12 and 13. The testimony concerning these documents indicates, however, that the guidelines appearing in these documents were either never enforced or possibly never even declared to be in effect.

Lucy Shorter made the following statements regarding these documents:

Q. Now, I'm going to show you what we've marked as Exhibit 12.

．　　．　　．　　．　　．

Q. Okay, I'm showing you what we've marked as Exhibit 12. Can you identify what that is, please?

A. This is a staff summary that was prepared by an assistant general manager of marketing to submit to the Board of Directors.

Q. And the purpose of that staff summary was to propose changes in the MBTA's advertising guidelines; is that correct?

A. Yes.

Q. Now, is that your signature on the third page of that document?

A. Yes.

Q. And by signing that, were you signifying that you agreed with these proposed changes in the advertising guidelines?

A. Yes.

Q. And that was submitted to the Board of Directors?

A. Yes.

．　　．　　．　　．　　．

Q. Okay. And I'm showing you Exhibit 13. Can you identify what that is, please?

A. This is on public service advertising policy. It's part of the same document, I believe.

Q. Well, if I suggested that Exhibit 13 is the MBTA's advertising and public service guidelines, with the changes proposed in Exhibit 12 included in it, if you could compare 12 and 13, I think you'd find that the proposed changes in 12 are included in Exhibit 13. Is that correct?

MR. BERTSCHE: Objection. It's a compound question. I don't know if he's asking the witness to agree to his renaming of the document or to tell him whether every change in Exhibit 12 is in Exhibit 13.

MR. SCHWARTZ: Your Honor, I'll rephrase the question.

THE COURT: All right.

Q. Do you agree that Exhibit 13 is the MBTA's commercial and public service advertising policy with the changes proposed in Exhibit 12?

A. I'm not so sure I can agree with that because I'm not sure that the Board adopted this policy. I don't recall whether this was really adopted.

Q. Okay. So the proposed policy in Exhibit 12 and the document in Exhibit 13, is it your testimony that you don't know whether or not that became the advertising policy of the MBTA?

A. I know that this was drawn up and presented, but I'm not sure that it was indeed voted and accepted because the only guidelines that I had to use in the early years were the guidelines in the bid specs and a two-page letter that an interim General Manager used.

Q. Okay, and we'll get to that in a moment. So in regard to Exhibit 13, is it your testimony that this might have been adopted or it might not?

A. My testimony is, I don't think it—

MR. BERTSCHE: Objection.

THE COURT: I'll permit the question. She's trying to clarify. Go ahead.

A. I don't believe that it was—I don't recall that it was adopted by the Board of Directors.

(Day 2, 75–78).

Robert Prince made the following statements about Exhibits 12 and 13:

Q. Okay. Let me show you Exhibit 12 and what we've marked as 13. 13 is commercial and public service advertising policy, and 12 is a staff summary sheet concerning the same, concerning that policy. Are you familiar with either of those?

A. No, sir.

Q. What about in 13? Are you familiar with that policy?

MR. KAPLAN: Objection. I'm not sure what "familiar" means. I mean, did he apply the policy? Has he seen it before?

Q. Have you seen it before?

A. I don't recall, sir, no.

Q. Are you aware that at some point that policy was in effect at the MBTA?

A. I don't recall.

Q. Are you aware of a commercial and public service ad policy adopted in or about February of 1993 by the MBTA?

A. I don't know, sir.

Q. You don't know whether or not that policy was ever adopted?

A. No, I don't. No, I don't.

MR. SCHWARTZ: Your Honor, I would offer defendant's interrogatory answers. They are answers to interrogatories No. 7, No. 9, and No. 13.

Q. I'm going to show you, in interrogatory Answer No. 7, reference is made to the commercial and public service advertising policy adopted by the MBTA in or about February, 1993, and the same reference is made in the other two interrogatories. Do you know what that policy was?

(Witness examining document.)

A. No, sir.

Q. Was that policy Exhibit 13?

MR. KAPLAN: Objection. I think this question has been asked and answered a couple times, and the witness has testified he didn't become General Manager until four years later.

THE COURT: The objection is overruled.

Q. Do you know whether the policy referred to in the interrogatory answer is the policy shown in Exhibit 13?

A. I don't know.

(Day 3, 11–12).

No other testimony about Exhibits 12 and 13 was presented at trial. It is the court's determination, primarily based on the testimony of Lucy Shorter, that these Guidelines were not applied by the T at the time Change the Climate submitted its advertisements. Also, the lack of any evidence that these guidelines were ever used to evaluate an advertisement leads the court to conclude that they were most likely never applied by the T.

On April 21, 1995, Robert Mabardy, the MBTA Interim General Manager, issued a letter that contained additional advertising guidelines, beyond the ones already described in the 1992 bid specification. The new guidelines stated:

MBTA ADVERTISING GUIDELINES

The MBTA will refuse any advertisement that is indecent as to child viewers, or is of a nature to frighten children, either emotionally or physically.

The following terms, as used in these guidelines, shall have the following meanings:

The terms "child" or "children" shall mean any child under the age of seventeen years.

The term "indecent" shall mean the exposure of children to language or pictures that describe or depict violent or brutal activities, or the end result of violent or brutal activities, whether such violence or brutality was intended or not, in a manner which causes a child physical or emotional distress or causes a child to fear for his personal safety or for the safety of other persons or animals.

These guidelines shall not be deemed to prohibit indecent or frightening language that could be considered double entendre, provided that, if a child asked an adult the meaning of such indecent or frightful language, the adult could give a reasonable and truthful answer without reference to indecent or frightening activities or language.

Exhibit 14 at 1–2.

I find that the applicable advertising guidelines, as of April 21, 1995, were contained in Article VII of the 1992 bid specifications as well as the Mabardy letter. *See* Testimony of Lucy Shorter (Day 2, 78).

The MBTA formulated new bid specifications in 1999. As stated previously, a dispute exists among the parties as to whether the 1999 bid specifications were in effect in January of 2000.

Article VII of the 1999 Bid Specifications states:

All advertisements at any time inserted or placed by the Contractor in or upon a any locations or display devices shall be of a reputable character, and the appearance of all advertisements shall be acceptable to and in accordance with the Massachusetts Bay Transportation Authority's standards for character and appearance of advertisements. No libelous, slanderous, or obscene advertisements, may be accepted by the Contractor for display in or upon the Authority's transit facilities. The MBTA will not accept advertisements containing violent criminal content, firearms, profane content, promotional materials that is [sic] harmful to juveniles, and advertisements that denigrate groups based on gender, religion, race, ethnic or political affiliation for display in and upon the Authority's transit facilities. Advertisements shall be submitted in advance to the Authority for review at the Authority's request or whenever the Contractor reasonably

believes such advertisements may be objectionable—within the meaning of this ARTICLE. Any advertisements determined by the Authority to be objectionable within the meaning of this ARTICLE shall be removed by the Contractor within 24 hours of notification of such determination. If the Contractor shall fail to do so, the Authority, at the Contractor's expense, may forthwith remove the same without liability for such removal.

The Authority shall be liable for actual costs and expenses, incurred by the Contractor for ordering the removal of any advertisement which the Authority has reviewed prior to placement, in accordance with the provisions with the provisions of this article.

The Authority reserves the right to request review of any and all advertisements.

Exhibit 16 at 16–17.

The court also notes that Article VIII of the 1999 bid specifications prohibits the advertisement of tobacco products. *See* Exhibit 16 at 17.

Because Change the Climate is seeking forward-looking relief and even challenging the MBTA's recent "Interim Guidelines," it is the court's determination that the 1999 bid specifications are relevant to the relief requested by plaintiff regardless of whether the 1999 bid specifications were in effect in January of 2000. The court also notes that numerous similarities exist between the text of Article VII in the 1992 and 1999 bid specifications. *See* Exhibits 11 and 16. Although the 1999 text provides additional grounds for denial of an advertisement, it does not describe in detail what types of advertisements fit into the stated categories. Also, both sets of guidelines leave the initial review of advertisements to an advertising contractor. Moreover, because of their generality, they

purport to leave significant discretion to the contractor to determine which proposed advertisements should be reviewed by the T.

## B. Lucy Shorter's Lack of Authority to Apply Guidelines

I find that Change the Climate's proposed advertisements were never properly submitted to decision-makers at the MBTA. I find also that because the proposed advertisements were never properly submitted, testimony as to whether the advertisements were prohibited by whatever guidelines were allegedly in effect is not exactly on point. It was only after the lawsuit was filed in this matter that the MBTA adopted a firm position as to the applicability of specific guidelines.

Lucy Shorter, therefore, was in fact the only employee of the MBTA who ever made any judgment before this lawsuit was filed as to whether one or more of Change the Climate's proposed advertisements satisfied the MBTA's advertising guidelines.

The court finds also that Shorter did not have the authority to make a decision on this matter that would be binding on the MBTA. This finding is consistent with the inferences I draw from other evidence before me and is also consistent with Shorter's testimony:

Q. And, Ms. Shorter, what exactly was your authority with respect to approving or disapproving ads to be displayed on the MBTA?

A. I had no authority.

Q. Even after 1995?

A. Even after 1995.

Q. Well, what was your role then?

A. I was the liaison, and that involved my intake and processing to the third floor any advertising that did not seem or that—any advertising that Park

Transit thought may or may not be within the guidelines. So I was the tracking—marketing was the tracking department. When it came in, attach a document, send it down for review and approval or denial.

Q. And you said—I forget the word you used—liaison or something to the third floor. What is the third floor?

A. The general manager's office.

Q. And who was it who had authority with respect to approving or disapproving ads to be displayed on the T?

A. The General Manager.

(Day 2, 168).

## C. Insufficiency of Proof of Viewpoint Discrimination by MBTA

Change the Climate alleges that the MBTA committed impermissible viewpoint discrimination when rejecting its advertisements. The court finds that Shorter's hastily written fax is not sufficient to support a finding of viewpoint discrimination.

It is the court's finding that the advertisements do promote the use of marijuana in subtle ways. Since an objectively sound reason exists to reject the advertisements, and since this reason is reflected in the hastily written fax, the court will not speculate as to Shorter's frame of mind when writing the fax.

Moreover, as the court has already concluded that Shorter did not speak for the T, her conduct could not constitute proof of viewpoint discrimination by the T.

## D. More on the Excessive Discretion Given to Advertising Contractor

Both the 1992 and 1999 bid specifications devote insufficient attention to the advertising contractor's responsibilities in applying the advertising guidelines. This problem results in excessive discretion given to the advertising contractor in determining when to seek the T's review for any particular advertisement.

## E. More on the Interim Guidelines and Defendants' Motion to Dismiss the Lawsuit

On April 16, 2002, defendants filed a motion to dismiss this lawsuit because of the T's formulation of Interim Guidelines to replace its previous guidelines (Docket No. 96). The court made the following ruling in its Order of April 30, 2002:

Docket No. 96 is ALLOWED to the extent that plaintiff's request that the court enjoin the MBTA's use of the former guidelines is DISMISSED AS MOOT, those guidelines having been replaced by a new set of guidelines. In all other respects, Docket No. 96 is DENIED.

The court still has before it the plaintiff's request that the court enjoin the earlier guidelines as unenforceable because in violation of plaintiff's rights of expression protected by the First Amendment of the Constitution of the United States as incorporated into the Fourteenth amendment to apply to actions of a state or any state-authorized entity exercising authority delegated by a state.

Moreover, the new guidelines have provisions that have practical effects that are the same or almost the same as the earlier guidelines in purporting to delegate to an allegedly independent contractor an allegedly nondelegable authority and responsibility for exercising discretion with respect to whether a particular proposed artistic or declarative expression satisfies the criteria for deciding whether it is compatible for display in one or more or none of the varied types of MBTA exterior and interior surfaces designated for advertising or other displays. The court recognizes

that it may take jurisdiction over any such claims as have been or may be raised by the pleadings, and that it may determine that it is appropriate to exercise this jurisdiction in this case rather than requiring that a new civil action be filed to assert such claims.

Docket No. 96 at 1–2.

The Interim Guidelines are much more comprehensive than the previous guidelines. The Interim Guidelines describe in much greater detail the categories of advertisements that the MBTA will not post. They also describe at greater length the relationship between the MBTA and its advertising contractor as well as the process by which a potentially noncompliant advertisement is reviewed. More must be done with these guidelines to bring them into compliance with the court's order below. Nevertheless, I find that the greater detail in the Interim Guidelines was an important step by the T.

The suggestions of its Acting General Manger, Michael Mulhern, are worthy of consideration by the MBTA as it takes further steps to bring its guidelines into compliance with the rulings stated in this Opinion and those to be made after the additional proceedings scheduled in the Order, stated below, at the end of this Opinion.

Mulhern provided testimony at trial regarding how he would recommend changing the applicable advertising guidelines This testimony preceded the proffer of the Interim Guidelines, after trial. The testimony was received in evidence during the three-day trial.

Q. Do you feel that the present guidelines leave too much room [for] subjective analysis?

A. I feel that the current guidelines could be better written to provoke the right questions.

Q. What do you mean by that?

A. Questions in themselves, rather than a string of statements with commas, I'd like to see each one of them deal with the issue that it's referencing as a question with plenty of white paper on the policy statement, so that folks' attentions are properly drawn to the different provisions so they can make good informed decisions and be able to articulate the reasons for making those decisions.

Q. What do you mean by plenty of white paper?

A. Easily read.

Q. I just don't know whether "white paper" is a term of art or it just means white space?

A. White space, questions with bullets with white space, an easily read document. I think sometimes contract documents are a little cumbersome to read.

Q. Do you think the present contract document gives sufficient guidance as to, for example, what "harmful to children" means?

MR. BERTSCHE: Objection. It's a confusing question. It's not clear whether he's asking him with respect to these ads or with respect to some other ads.

MR. SCHWARTZ: In general.

THE COURT: You may answer.

A. I would like to see a better description of what "harmful to children" is.

(Day 2, 129–30).

The court finds that the suggestions by Mulhern as to how to improve the guidelines have merit, yet were not implemented in the recently submitted Interim Guidelines.

## F. Defendants' Motion to Limit the Scope of Judgment

The defendants have recently filed a motion to limit the scope of the court's judgment to five provisions of the advertising guidelines. *See* Docket No. 119. The record before the court is inadequate to support the proposed ruling at this time. Moreover, as expressed by the court in other parts of this Opinion, a primary concern in this case is the extent of the discretion given to a private advertising contractor to enforce broadly worded guidelines. The danger of arbitrary action by the contractor when applying the guidelines would not be obviated by addressing only five of those guidelines.

The Motion to Limit the Scope of the Judgment (Docket No. 119) is DENIED in the Order below.

## G. Application of Guidelines to Other Advertisements

Numerous other advertisements, both commercial and non-commercial, beyond those thus far described in this Opinion, were submitted by the parties as examples of advertisements reviewed by the T under the applicable guidelines. *See* Exhibits 20–34 (proposed advertisements reviewed by the T); *see also* Exhibits 18A–18GG (photographs of advertisements posted by the T). It is the court's finding that the T has made a policy and practice of applying its guidelines to advertisements and rejecting those advertisements it considers to be in violation of the guidelines. The T has rejected a number of advertisements over the past ten years and has taken down advertisements after they have been posted when an alleged violation has been brought to its attention.

A dispute exists between the parties as to the consistency of enforcement of the Guidelines. The court addresses this dispute in Part VII, below.

## H. More on the Relationship Between the MBTA and the Boston Public Schools

It is beyond genuine dispute that the Boston Public Schools use the MBTA to provide transportation to and from school for its students. Cornelia Kelly, the headmaster of Boston Latin High School, testified about the relationship between the T and Boston Latin as well as other Boston high schools:

Q. I'm going to ask you some questions about how your students get to and from school. Does the Boston public school system have a policy about providing transportation to public school students?

A. Yes. The school system provides transportation to students who live outside of what's called the walk zone, and that transportation can be yellow charter buses or it can be MBTA buses.

. . . . .

Q. And how is it that the Boston School Department provides transportation to eligible students?

A. What mechanism do they use?

Q. Yes.

A. In the case of certainly at the Latin School and in the case of some of the other high schools, students are provided with a T pass to be used on T buses.

Q. Are these MBTA buses?

A. These are MBTA buses, yes.

Q. Do the students also use the subway trains with those passes?

A. Yes, indeed, some people use the trains, some people use the trolley, yes.

Q. So does the School Department not have its own fleet of buses?

A. The School Department does have a fleet of yellow buses that it uses, I think primarily for younger students.

Q. But it also uses the MBTA buses and subways?

A. Yes, indeed. Yellow buses are expensive.

Q. So do you have an understanding of why the School Department relies on the MBTA?

A. I think the School Department relies on the T because it's more cost-efficient, because the T has regular bus runs that go all over the city, and giving young people T passes allows them to use that system.

Q. So would it be more expensive if the school system were relying solely on yellow buses?

A. It would be very—

MR. SCHWARTZ: Objection.

THE COURT: Ground?

MR. SCHWARTZ: I don't know that this witness is qualified to compare the cost of transportation systems.

THE COURT: Well, I think she's certainly qualified to know that it costs more to use the yellow buses than to use the T, and whatever other practical means of transportation might be available. The objection is overruled.

Q. You can answer.

A. The problem is, I forget. I listened to what you said.

Q. Oh, I'm sorry. Do you have an understanding that there are budgetary reasons why the School Department relies on the MBTA to provide transportation to students?

A. Yes, indeed. Yellow buses are very expensive to run.

Q. Do you know how long the Boston School Department has had this relationship with the T where it provides transportation to students by giving them T passes?

A. I would say to you that it certainly predates my time at the Latin School.

It's been a long-standing relationship, in that young people who have come to the Latin School have for years used the MBTA as a primary mode of transportation.

Q. So it certainly goes back to before 1980 when you joined the Boston Latin School?

A. Yes, indeed, it goes back before then.

Q. So I take it the Boston Latin School participates in this program?

A. Boston Latin School uses the MBTA pass program, yes, indeed.

Q. And I think you told us that the Boston Latin School has 2,400 students; is that right?

A. Correct.

Q. Of those students, approximately how many receive monthly T passes as their means of transportation to and from school?

A. I would say that approximately 2,100 students receive T passes every month.

Q. So seven out of eight Boston Latin students receive T passes every month?

A. Seven out of eight is correct, yes.

Q. And for those seven out of eight, who pays for their T passes?

A. The School Department does.

Q. Do Boston Latin students ride school buses other than MBTA buses?

A. The Latin School has one, what we call one yellow charter because that comes in the morning, and two yellow half buses for handicapped students.

Q. So it has one of the big yellow school buses?

A. Correct.

Q. And how many MBTA buses serve Boston Latin students?

A. Approximately twenty-two.

Q. Headmaster Kelley, are you familiar with how the T pass program is administered, how it runs?

A. I'm familiar with what happens when the T passes come to the Latin School. T passes are delivered to us, are delivered to the school system, and the school system delivers them out to the schools. And then we as a school, they come—I should back up. They come with a printout of the homerooms, the number of students in each homeroom who are assigned to receive a T pass. And then we count out the exact number of T passes and give out the homeroom list, and those are given to students. And those students who might be absent, the passes come back to us.

Q. Is there a department within the Boston public school system that is in charge of running this program?

A. Yes, indeed. The school system has a Department of Transportation.

Q. And so is it the Department of Transportation that sends the passes to Boston Latin School?

A. Yes, it is.

Q. And then the Boston Latin School distributes the passes to students where?

A. In homeroom.

Q. In homeroom. So every month students who receive the T passes will get them in their homeroom?

A. Correct.

MR. KAPLAN: Your Honor, may I approach the witness?

THE COURT: You may.

Q. Headmaster Kelley, I'm showing you what's been marked for identification as Exhibit E. Can you tell me what it is?

A. Exhibit E, it is the MBTA student pass authorization log, and this runs from September of 2000 to June of 2001.

Q. Do you see on the first page there's a certification by an official of the Department of Transportation of the Boston Public Schools?

A. Yes, I do.

MR. KAPLAN: Your Honor, at this time I'd like to offer this document as an exhibit. It's a self-authenticating public record of the Transportation Department of the Boston Public Schools.

MR. SCHWARTZ: No objection.

THE COURT: All right, received in evidence as Exhibit 46

(Exhibit 46 received in evidence.)

Q. Headmaster, Kelley, if you would, please turn to the second page of Exhibit 46. Can you tell from looking at the second page of Exhibit 46 how many Boston Latin students received an MBTA T pass in September of 2000?

A. In September of 2000, 2,197 students received a T pass.

Q. And can you tell us based on the second page of Exhibit 46 how many students from Charlestown High School received T passes that month?

A. Charlestown High School received 1,076.

Q. And how about Madison Park High School?

A. Madison Park High School received 1,099.

Q. And how about West Roxbury High School?

A. West Roxbury High School received 1,274.

Q. And, of course, are there other high schools listed with their numbers of T passes that the students received that month?

A. Yes, indeed.

Q. Do Boston Latin students have a choice about whether they take a yellow school bus to school or an MBTA bus?

A. Boston Latin School only has one yellow bus, and that's specifically assigned to a particular section of the city. Every other student, the option is only the MBTA bus.

Q. So they are assigned based on where they live?

A. Correct.

Q. And remind me, do students pay for the passes?

A. No, students do not pay for the passes.

Q. Who does?

A. The School Department does.

Q. Now, when Boston Latin students get out of school every afternoon, do they have to walk a few blocks and find the nearest subway or bus stop to get on their bus or subway?

A. No, they do not.

Q. And why is that?

A. At the end of the school day—we're located on Avenue Louis Pasteur. At the end of the school day, the MBTA buses line up at the avenue from the Simmons College end, which is the Fenway, all the way along the avenue up to Longwood Avenue, going from Simmons to the hospital.

Q. And so how many buses are there that line up?

A. Approximately 22.

Q. So does it stretch the whole block?

A. It certainly does.

Q. What time does that occur?

A. The buses usually come sometime around 2:00 o'clock, and dismissal actually occurs at 2:15.

(Day 2, 15–22).

### VII. Some Conclusions of Law

#### A. Government as Proprietor

■ The government has more latitude to regulate expression when it occurs on government property. In these situations the government is acting in its role as proprietor, and is permitted to consider the intended use of an area and the conflicting rights of other users of the space. *See International Society v. Lee*, 505 U.S. 672, 678, 112 S.Ct. 2701 (1992); *see also New England Regional Council of Carpenters v. Kinton*, 284 F.3d 9, 20 (1st Cir.2002).

#### B. Role of Courts in Weighing Competing Claims of Right

It is the court's peculiar duty to make judgments between competing claims of right. The conflicting rights identified to the court in these proceedings include (1) Change the Climate's right to post advertisements on the T, (2) the T's right to refuse to post advertisements on government property that violate its regulations, and (3) the rights of children, as well as parents, for children to use the T without being exposed to advertisements that promote illegal behavior or that have messages harmful to children. As will be further explained in this Opinion, the court finds that the T's attempt to enforce reasonable regulations protecting children is appropriate and outweighs Change the Climate's claimed right to be able to post any advertisement it desires.

Neither side, however, has given adequate attention to the rights of the riding public in general. "The streetcar audience is a captive audience. It is there as a matter of necessity, not of choice." *Lehman*, 418 U.S. at 302, 94 S.Ct. 2714 (internal quotations omitted). A number of the rejected advertisements shown to the court during these proceedings, as well as Change the Climate's proposed advertisements, pose serious questions as to what a captive audience can properly be exposed

to in their daily use of public transportation. The riding public pays for the T through their fares and tax dollars, and many of the T's users have no choice but to use the T.

■ At one point in proceedings before the court, counsel for the plaintiff stated that it is exclusively the legislature's duty to account for the public interest. *See* Docket No. 106 at 29. This statement is wrong as a matter of law. Where the legislature has not acted, or where the public has an interest that is not being adequately protected by the parties to the dispute, the court must take the public interest into account. This proposition is reinforced by the history of development of the Constitution of the United States of America.

### C. Madisonian Principles Require the Court to Consider the Public Interest

The United States of America, as well as the Commonwealth of Massachusetts, are republics in which the people, through their representatives and magistrates, engage in self-government. As stated by James Madison in the Federalist Papers:

> The first question that offers itself is, whether the general form and aspect of the government be strictly republican. It is evident that no other form would be reconcilable with the genius of the people of America; with the fundamental principles of the Revolution; or with that honorable determination which animates every votary of freedom, to rest all our political experiments on the capacity of mankind for self-government. If the plan of the convention, therefore, be found to depart from the republican character, its advocates must abandon it as no longer defensible.

. . . . .

If we resort for a criterion to the different principles on which different forms of government are established, we may define a republic to be, or at least may bestow that name on, a government which derives all its powers directly or indirectly from the great body of the people, and is administered by persons holding their offices during pleasure, for a limited period, or during good behavior. It is ESSENTIAL to such a government that it be derived from the great body of the society.

James Madison, Federalist Papers, No. 39.

Indeed, the legitimacy of the laws of the United States emanates from the republican character of their adoption as well as the representative nature of our government. As Madison further states, "attempts to enforce by legal sanctions, acts obnoxious to so great a proportion of Citizens, tend to enervate the laws in general, and to slacken the bands of Society." *See* James Madison, Memorial and Remonstrance (1785).

### D. Public Interest is Distinct from Political Backdrop

This Opinion emphasizes that it does not adopt plaintiff's view of the relevance of the "political backdrop" of this dispute. *See* Docket No. 41. The court rejects any notion that it must express no view on any issue that is allegedly political in the sense that it concerns an issue of public concern and differences of opinion such as do exist in fact over attempts to legalize marijuana and the "war on drugs." *See Change Climate v. MBTA,* 202 F.R.D. 43, 46–48 (D.Mass.2001). It is the court's obligation to take into account issues of public concern and debate as they bear upon issues of law and fact that must be decided to resolve the dispute before the court. Invoking the specter of "political backdrop"

cannot change this reality about fair and appropriate adjudication.

The court is obligated to and will decide this case by considering and weighing the rights and interests of all parties affected by the judgment that resolves this controversy. This role is proper for a court, which sits as an impartial adjudicator. This role of courts is a fundamental characteristic of the American legal system.

The roles of twenty-first century legal professionals in the Bar, Bench, and Academies in the United States owe much to James Madison's seminal thinking expressed publicly and privately during debates over the structure of the new form of related state and national governments to be established under a constitution drafted in May 1787 to cure deficiencies in the Articles of Confederation (1777). *See generally* John P. Kaminski, Ph.D, Director, and Richard Leffler, Ph.D., Co–Director, The Center for the Study of the American Constitution, The University of Wisconsin–Madison, *The Origins of the Three Branches of Government*, Federal Judicial Center Traveling Seminar 3–9 (2001) (Wisconsin Study). As a reminder of timing of important events, I reproduce here excerpts from the Wisconsin Study's "Chronology of the American Revolutionary Era":

| | |
|---|---|
| 1774 September 5 | First Continental Congress |
| 1775 April 19 | Battles of Lexington and Concord |
| 1775 May 10 | Second Continental Congress |
| 1775 June 17 | Battle of Bunker Hill |
| 1776 July 4 | Declaration of Independence |
| 1777 November 15 | Congress Agrees to Articles of Confederation |
| 1781 March 1 | States Adopt Articles of Confederation |
| 1781 October 19 | British Surrender at Yorktown |

. . . . .

| | |
|---|---|
| 1786 Sept. 11–14 | Annapolis Convention (Proposes Constitutional Conv.) |
| 1787 February 21 | Congress Calls Constitutional Convention |
| 1787 May 25 | Constitutional Convention Meets |

. . . . .

Professionalism of persons educated in law, as it came to be recognized in the United States in the late nineteenth century and the early decades of the twentieth century, did not exist in the time of the Founders. Its development owed much to the Founders' ideas about the roles of impartial judges, and advocates who would appear before them. The earliest readily accessible record of public discussion of ideas about developing a corps of impartial judges and advocates is the record of communications occurring, publicly and privately, as the Founders proceeded with their drafting of a proposed constitution. We now have an increased treasure trove of records of these spirited debates that includes materials gathered, pruned, edited, and published, along with incisive commentary, by the Directors of the Wisconsin Study. *See, e.g., The Origins of the Three Branches of Government, supra.*

Strangely, at least from the perspective of twenty-first century mores of communication, a large part of the essence of those debates was exposed contemporaneously in publications more like twentieth and early twenty-first century newspapers than books, or magazines, or professional journals. That large body of expressions is available to interested twenty-first century readers in collections commonly referred to as "federalist" papers or, in terminology perhaps suggestive of an effort to be less biased in collecting and editing, "federalist and anti-federalist."

Those eighteenth-century debates occurred more than two centuries ago. Twenty-first century readers are even more removed than the lapse of time suggests from being in tune with the spirit and culture surrounding the debates over what became the Constitution of the United States and the Bill of Rights embodied in the Amendments adopted forthwith. Those debates were strikingly lively and thorough examinations of the history of peoples' ideas and efforts to form governments powerful enough to preserve the order essential to protection of individual liberty and at the same time subject to inherent controls against abuse of power likely to lead to despotism.

Ideas about liberty and order are no less relevant now than they were when the Founders developed the distinctive form of federalism that is the genius of the document we call the Constitution of the United States of America. "The aim of the American legal system is liberty and justice for all. How close we come to that aim depends on good judging." Robert E. Keeton, *Judging in the American Legal System* 1 (Lexis Law Publishing 1999).

> The quality of judging in a legal system depends on commitment. It depends, first, on commitment to the aim of justice. Second, it depends on commitment to professionalism. The declared beliefs of all professionals in the system—including advocates, counselors, and academic critics as well as judges—affect the quality of judging in the system. Third, the quality of judging depends on commitment to method. Judicial choice, at its best, is reasoned choice, candidly explained.

*Id.* at 5.

We members of the Bar, Bench, and Academies in the United States of America have long considered ourselves to be professionals in the highest and most honorable sense. I do not hesitate to say "we" in this context, since I have long been a member of the Bar, then Academies, and finally the Bench, at each step preserving my previous sense of belonging and adding another. We have had a tradition of mutual encouragement of professionalism that places the interests in doing justice above personal interests of all kinds. It is part of this tradition that one's seeing examples of professionalism in the performance of judges and advocates encourages one's own adherence to professional standards.

> Whether or not you are a judge or ever expect to be one, it makes a difference how well you understand judging in our legal system and what you believe about commitment to the aim of justice, to professionalism, and to method in judging.

*Id.* at 7 (footnote omitted).

Have changes occurred that make us less likely now to express our sense of professionalism and less likely to attribute any credit to our eighteenth-century predecessors? I believe so, and I believe the issues presented in the case before me illustrate a need for reflection about ways in which reexamination of the thoughtful eighteenth century debates may illumine problems we confront now.

The extent to which we, in the twenty-first century, are indebted to the Founders for the freedom and order we now experience is rarely expressed. Occasions do arise, however, when it becomes appropriate to take note of our debt to the Founders. Issues presented by the circumstances of submissions now pend-

ing before me in this case create an appropriate occasion to examine James Madison's contributions to federalist thought and action, and to consider their relevance to attitudes and actions of twenty-first century professionals in law. *Dow v. Donovan,* 150 F.Supp.2d 249, 268–70 (D.Mass.2001).

## E. Taking Into Account the Public Interest

As stated immediately above, it is the court's conclusion that the public's interest in reasonable advertising guidelines regarding use of the T's spaces devoted to advertising must be taken into account in the court's decision about the final outcome of this case in further proceedings before this court.

The court has also previously stated, and confirms here, that the views of parents must also be taken into account. As stated by the court at the Hearing of April 30, 2002:

Among the interested persons, in the whole array of people who are interested in the outcome of this lawsuit before me, are parents who are concerned that they would rather have their children see the beautiful instead of only the lurid and tawdry. I must consider these parental interests.

And I think I should make some kind of provision for having these interests expressed to me, either by parties or by so-called amicus curiae briefs, or in some other way. At the least I should consider these interests before I make my decisions, even though neither of the parties has asked me to let them be heard.

Docket No. 106 at 28.

The circumstances of this case show a compelling need for a broadly based advisory board, the function of which would be to aid the MBTA in understanding and evaluating all of the interests, public and private, that are at stake in the regulation of an advertiser's proposed use of MBTA spaces. In the Order below, the court invites submissions from the parties by August 30, 2002, regarding the establishment and composition of such a board.

## F. Envisioning a Spectrum from Beautiful through Middling to Ugly

Advertisements of the kinds at issue in this controversy involve a large array of different pictorial and verbal expressions that may be envisioned as occupying positions along a spectrum that extends all the way from the beautiful through the middling to the ugly. Ordinarily we envision a linear depiction of a spectrum as horizontal. If, instead, we envision a vertical depiction with "beautiful" at the top and "ugly" at the bottom, and imagine a progression over time of proposed advertisements to be evaluated, each occupying a position somewhere along this spectrum, we may observe a tendency of either upward or downward movement along the spectrum.

The MBTA's counsel undertook to prove in this case that the MBTA had been extraordinarily receptive to advertisements that would be offensive to most users of the T. They succeeded. Indeed, they dedicated more than two hours to a needlessly prolonged and repetitive courtroom drama on this point. Envisioned on a vertical depiction of the spectrum just described, this small but potentially very significant courtroom drama showed a downward spiral from the beautiful toward the ugly, with special emphasis on the power of the tawdry to crowd out any pictorial or verbal expressions of the beautiful about the human spirit and human behavior. That such a tendency as this may have been proved as a fact in this case, however, does not mean that the

court or the community must accept it as an inevitable price to pay for freedom of expression.

It is also the court's conclusion, expressed at the Hearing of April 30, 2002, that advertisers such as Change the Climate can express their messages of dissent in a way compatible with the public interest in protection of other rights and interests at stake. In referring to advertisements received in evidence at trial, at the later Hearing of April 30, 2002, the court stated:

> You proved it [your acceptance of dissenting messages] to me in spades when you showed me all that series of lurid, tawdry, I could apply several other adjectives, that forced out the beautiful. Now, I discern a difference between the lurid, tawdry, and sordid and the beautiful. And I think it's going to be very difficult to persuade me that the unvarnished, straightforward truth is always sordid and never beautiful. I believe that both in relation to the human spirit and to the world around us, the beautiful is as likely to be true as the most sordid, tawdry, and lurid. They have equal possibilities of being true. And so it's going to be very hard to persuade me that in the name of a search for truth, I should always let the other things crowd out the beautiful about the human spirit and the world around us.

Docket No. 106 at 13–14.

## G. A Reasonableness Test for Advertising Guidelines

■ It is the court's conclusion that the most appropriate test to apply in addressing the advertising guidelines is a reasonableness test. The court will look especially, though not exclusively, to two factors; (1) whether the guideline is viewpoint neutral and (2) whether it is a reasonable restriction on content.

In determining the reasonableness of a restriction on content the court will consider the captive audience on the T as well as the presence of children.

This reasonableness test is similar to one applied by the Supreme Court in *Good News Club v. Milford Central School*, 533 U.S. 98, 106–07, 121 S.Ct. 2093, 150 L.Ed.2d 151 (2001).

The court notes that although the components of the reasonableness test are similar to ones currently applied to restrictions on content in non-public and limited public forums, the court in no way bases its ruling on forum law. Instead, for the reasons explained in Part III of this Opinion, it is the court's determination that the MBTA's advertising space does not fit squarely into any of the forum categories established by the Court of Appeals for the First Circuit. Nevertheless, it is the court's opinion that this reasonableness test is appropriate in view of the conflicting rights and interests at stake in this controversy.

As a corollary to the reasonableness test, the court will not permit advertising guidelines to be worded or enforced in a manner that is in conflict with Supreme Court precedent. In *Lehman*, the Supreme Court held that the city's policies and practices in regulating expression on the subway cars must not be "arbitrary, capricious, or invidious." *Lehman*, 418 U.S. at 303, 94 S.Ct. 2714.

■ The T contends that it is not in violation of the *Lehman* standard because it has manifested its intention, through action, to enforce its guidelines in a consistent manner. The court is nevertheless concerned that continuing reliance on a private advertising contractor, without clear and easily applicable guidelines, presents a danger of arbitrary action by the contractor that must be addressed ade-

quately by the T as it formulates new guidelines, in order for them to pass muster.

## H. Guidelines Must be as Concise as is Consistent with Clarity, and Free of Calculated Ambiguity

Guidelines should be user-friendly. Defense counsel acknowledged this point both in oral argument and in post-argument submissions and contended that both the initial guidelines and the Interim Guidelines satisfied this requirement.

 To be user-friendly in fact, however, I find that the T's guidelines must be as clear in content and meaning as it is possible to make them, and as crisp and readable as clarity permits. *See* Robert E. Keeton, Guidelines for Drafting Editing and Interpreting, GL1.1(a), GL1.1(b) (Lexis/Nexis 2002).

In addition, a reasonably good set of guidelines should have these additional characteristics:

GL 1.3 Prefer short sentences.

GL 1.4 Prefer plain English.

GL 1.5 Be consistent in terminology.

GL 1.6 Organize to serve clarity, readability, and brevity.

GL 2.1 Prefer the singular number.

GL 2.2 Prefer the present tense.

GL 2.3 Prefer the active voice.

GL 2.4 Use syntactic conventions that aid clarity, order, and readability.

GL 3.1 Organize clearly and consistently.

GL 4.1 Omit every superfluous word.

GL 4.3 Use relative pronouns carefully and consistently.

GL 8.2 Accentuate the Positive.
*Id.*

## VIII. Enforcement of Guidelines and Transactions Beyond Law

As stated previously in this Opinion, it is the court's determination that the T has attempted to enforce the advertising guidelines at issue in this case. Evidence has been presented, however, that the T has been unable to enforce its guidelines in a consistent manner both because the T relies heavily on its advertising contractor to screen the ads and also because the guidelines are difficult to apply.

 It is the court's determination that the T need not show perfect consistency in the application of its guidelines in order to preserve a reasonable measure of control over the use of its advertising space. The T must show, however, that through its "policy" and "practice" it has maintained and enforced only reasonable limits on its advertising spaces. A court cannot reasonably demand of any public entity such as the T that it adhere to an impossible standard of perfection in applying its Guidelines.

To understand law well, we need to understand its functions and limits. We need to know both the scope of its reach and the nature of things beyond its reach. We need to understand the other institutions that contribute, along with law, to achieving a social, cultural, and political order, and to understand the relationships among law and these other institutions and methods of influencing and controlling human behavior to make a civilized society possible.

No legal system has ever, or will ever, achieve total control over the relationships and events occurring within its geographic area. The effective reach of law and of the legal system that pro-

vides for its enforcement is never universal.

The reach of law depends in part on effective enforcement, even in a community strongly committed to respect for law. Enforcement of law depends on the actions of individual human beings to whom official responsibilities are assigned, formally or informally. Their human failings cause even the most determined efforts at enforcement to fall short of the goal. Always, some mandates of the law remain unenforced, and to some degree unenforceable. In short, some things are beyond law, by necessity.

Keeton, Judging in the American Legal System, pp. 129–30 (2000).

The court commented on the applicability of this principle to this case at the Hearing of April 30, 2002.

The civilized order under which we live under the American legal system has protections for freedom of action and freedom of expression far beyond the First Amendment, and the First incorporated into the Fourteenth. Those both deal with restraints imposed by governmental entities, federal or state. [In fact], our society functions with centers of power in other places, centers of political power, centers of social power, economic power, that are often centers of greater power than either the executive, legislative, judicial branches, state and federal, all combined exercise in a particular context. Sometimes all of these governmental entities deliberately choose not to exercise all of the authority they have under the Constitution and the laws of our federal system and the unique form of federalism that we have in the United States of America. And when we have those exercises of transactions of economic form or declarative form, speaking form, expressions, artis-

tic, declarative, in which the governmental entities have deliberately chosen not to occupy the whole field, we look to the private entities for participation in the process of formulating how we live together in a way that is constructive instead of destructive of civilized order. I have referred to those transactions that are governed by the private part of the power structure as transactions beyond law for two reasons. They are transactions beyond law, first, in instances where the governmental entities have chosen not to occupy the whole field, and so they don't purport to try to govern by law all of the restraints and guidelines for actions that enable us to live together in a civilized order. But there's a second reason also, that even if the governmental entities tried their best to occupy the whole field and leave nothing beyond law, they couldn't succeed because it would still be impossible to marshal the resources that would enforce all of the restraints of law, so there would still be transactions beyond law in that sense.

In other words, there are two kinds of transactions beyond law, transactions beyond law because the organizations using the law have chosen not to occupy the whole field, and, second, transactions beyond law in the sense that they can't do it even if they tr[y] to.

Docket No. 106 at 27–28.

The fact that the T cannot be a perfect enforcer of its advertising guidelines does not mean, however, that the T can satisfy its obligations by using overly general guidelines, especially in view of the fact that a contractor will be applying them in the first instance. The T will have to provide further guidance to its advertising contractor as well as its own employees regarding what falls inside or outside the reach of its guidelines.

In this lawsuit and as to issues now to be decided, the court determines that the T's guidelines as well as its "policy" and "practice" squarely prohibit the type of advertisements proposed by Change the Climate. To the extent that this presents an issue of potential violation of constitutionally protected rights of Change the Climate or other potential applicants for use of the limited spaces available, the court must fashion an appropriate form of order that meets the need for judicial intervention but is not more intrusive than need be.

### IX. Provisional Remedies

Based on the findings of fact and conclusions of law stated above, the court holds that the MBTA need not post any of the advertisements proposed by Change the Climate at this time.

In the Order below, the MBTA is directed to revise its guidelines in a manner that specifically and clearly states the factors that it will consider when applying a particular guideline to a particular advertisement.

It would be inappropriate for the court to draft the revised guidelines itself as this function is more appropriately left to officials appointed by the MBTA as an agency of the Commonwealth of Massachusetts. *See United Food and Commercial Workers v. Southwest Ohio Regional Transit Authority*, 163 F.3d 341, 362–63 (6th Cir. 1998). The court will require that the MBTA revise its guidelines in a manner that (a) clearly delineates the extent to which advertising space is open to non-commercial advertisement and (b) provides straightforward instructions as to how to evaluate the content of any particular advertisement.

The court also rules that the MBTA must undertake greater oversight of its advertising contractor and that this oversight must be described and defined in any future guidelines presented to the court.

Change the Climate and the MBTA are invited to make submissions by August 30, 2002, regarding the proposal, explained in Part VII.E, that the MBTA use an advisory board in the formulation of its new advertising guidelines.

Change the Climate and the MBTA are also invited to make submissions by August 30, 2002, regarding the possible adaptation and use of advertising guidelines that have been used by transit systems other than the MBTA.

The court's order below as to remedy is therefore provisional and is not a final ruling as to the constitutionality of advertising guidelines to be applied in the future. The MBTA must bring its advertising guidelines into compliance with this court's Opinion. Once the MBTA submits a new formulation of a written policy that it contends is in compliance with this Opinion, the court will again consider whether Change the Climate's proposed advertisements must be posted. During the interim, Change the Climate is free to make amendments to its proposals, either on its own or in consultation with the MBTA, in an effort to bring them into compliance with this Opinion.

### INTERLOCUTORY ORDER

For the foregoing reasons, it is ORDERED:

(1) Defendants' Motion to Limit the Scope of Judgment (Docket No. 119, filed July 9, 2002) is DENIED;

(2) The MBTA is directed to revise its guidelines in a manner that specifically and clearly states the factors that it will consider when applying a particular guideline to a particular advertisement;

(3) The MBTA must revise its guidelines in a manner that (a) clearly delineates the extent to which advertising space is open to non-commercial advertisement and (b) provides straightforward instructions as to how to evaluate the content of any particular advertisement;

(4) The MBTA must undertake greater oversight of its advertising contractor and this oversight must be described and defined in any future guidelines presented to the court;

(5) The MBTA need not post any of the advertisements proposed by Change the Climate at this time;

(6) Change the Climate and the MBTA are invited to make submissions by August 30, 2002, regarding the composition and duties of a broadly based advisory board, the function of which would be to aid the MBTA in understanding and evaluating all of the interests, public and private, that are at stake in the regulation of an advertiser's proposed use of MBTA space;

(7) Change the Climate and the MBTA are also invited to make submissions by August 30, 2002, regarding the possible adaptation and use of advertising guidelines that have been used by transit systems other than the MBTA;

(8) A Case Management Conference is scheduled for **September 20, 2002** at **9:00 A.M.**