TORRUELLA, Circuit Judge
(Concurring in part, Dissenting in part).
Since the majority agrees with me in Case No. 03-2285 (“Change the Climate ”) that the MBTA engaged in unconstitutional viewpoint discrimination by rejecting all three of Change the Climate’s advertisements, it is appropriate that I concur in the outcome of that appeal. Unfortunately, I can neither join the opinion of my learned colleagues on the remainder of its analysis, nor join in the outcome of Case No. 03-1970 (“Ridley ”). In my view, regardless of the nature of the forum involved, the MBTA’s rejection of Ridley’s third proposed advertisement was unreasonable and constitutes viewpoint discrimination, abuses made possible by the vague and subjective nature of the MBTA’s “demean[ing] or disparag[ing]” standard. Consequently, it is unnecessary for this court to forge into the murky waters of forum analysis — an issue, it is worth noting, irrelevant to the outcome in Change the Climate and not even raised by the *97 plaintiff in Ridley. See AIDS Action Comm. of Mass., Inc. v. Mass. Bay Transp. Auth., 42 F.3d 1, 12 (1st Cir.1994) (finding forum analysis unnecessary when restriction violates prohibition on viewpoint discrimination, and undesirable on a record not fully developed by plaintiff-appellant); see also Laurence H. Tribe, American Constitutional Law § 12-24, at 988 (2d ed.1988) (deeming “public forum classifications ... unnecessary and unhelpful” in challenges to content-based restrictions).[1] If, however, the nature of the forum created by the MBTA’s opening its facilities to commercial and non-commercial advertisers must be decided, we cannot allow ourselves to be led astray by the MBTA’s hollow protestations that it did not intend to open its facilities to free expression. Accordingly, I would find that the MBTA has created a public forum for the expression of ideas such as those contained in Ridley’s third advertisement.
I. Rejection of Ridley’s advertisement
I need not repeat much of the background already provided by the majority. Suffice it to say, the offending guideline allows the MBTA to refuse any advertisement that “contains material that demeans or disparages an individual or group of individuals.” The guideline states that the MBTA will determine whether the advertising contains such offending language by reference to “whether a reasonably prudent person, knowledgeable of the MBTA’s ridership and using prevailing community standards, would believe that .the advertisement contains material that ridicules or mocks, is abusive or hostile to, or debases the dignity or stature of, an individual or group of individuals.”
Regardless of how the MBTA’s forum should be classified, the MBTA’s content-based restrictions must (1) be “reasonable in light of the purpose served by the forum,” Cornelius v. NAACP Legal Def. & Educ. Fund, 473 U.S. 788, 806, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985), (2) not discriminate on the basis of viewpoint, see id. at 800, 105 S.Ct. 3439 (“Access to a nonpublic forum ... can be restricted as long as the restrictions are ‘reasonable and [are] not an effort to suppress expression merely because public officials oppose the speaker’s view.’ ” (quoting Perry Educ. Ass’n v. Perry Local Educators’ Ass’n, 460 U.S. 37, 46, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983)), and (3) not be so vague as to lead to arbitrary or discriminatory application, see, e.g., Grayned v. City of Rockford, 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972) (“[I]f arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them.”). See also AIDS Action, 42 F.3d at 13 (“[The MBTA] will, at the least, need to act according to neutral standards, and it will need to apply these standards in such a way that there is no appearance that ‘the [government] is seeking to handicap the expression of particular ideas.’ ” (quoting R.A.V. v. City of St. Paul, Minn., 505 U.S. 377, 394, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992)). The MBTA’s rejection of Ridley’s proposed advertisement fails on all of these points.
*98 As indicated in appellant’s brief, the “prevailing community standards” language contained in the offending MBTA rule is the MBTA’s attempt to breathe validity into its regulation by interjecting one prong of the three-prong test in Miller v. California, 413 U.S. 15, 24, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973), for determining whether speech is obscene. One out of three prongs, however, is insufficient to cure the guideline’s defect. “Just because a definition including three limitations is not vague, it does not follow that one of those limitations, standing by itself, is not vague.” Reno v. ACLU, 521 U.S. 844, 873, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997) (holding that the Communications Decency Act, which used a “contemporary community standards” test to regulate obscene speech on the Internet, offended the First Amendment because it was unconstitutionally vague).
Indeed, the very idea that the MBTA considers that there is such a thing as a “prevailing community standard” for demeaning or disparaging expression is itself ridiculous. How would such a rule be discerned? What evidence is there in the record that the third advertisement violated this standard, other than the MBTA’s subjective and conclusory assertion that it did? To the contrary, a religious message such as the advertisement in question does not disparage its targets, but rather alerts them to a (perceived) fact concerning their eternal salvation.[2] This is not a ease of a hate group defaming the followers of Judaism, Catholicism, or another religion as having some intrinsic individual flaw. Rather, Ridley’s advertisement attempts to convert these people to her religion. Telling people they are risking going to hell is, like it or not, a key component of explaining why religious choices are so important, and reasonable minds could most certainly disagree with the conclusion that such a statement in any way demeans or disparages the very people it aims to save. That such a statement was considered “hostile,” “mock[ing],” or “demean[ing]” highlights the ambiguity and unreasonableness of the MBTA’s guideline. The “prevailing community standard” formulation does not rescue the MBTA’s guideline from vagueness; rather, it permits MBTA authorities — even if they have the best of intentions — to make subjective, ad hoc determinations about speech that appears controversial because it endorses a minority viewpoint. Cf. Keyishian v. Bd. of Regents, 385 U.S. 589, 603, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967) (stating that the First Amendment protects against an oppressive “pall of orthodoxy” in schools). The guideline, therefore, is void for vagueness.[3]
*99 The MBTA has permitted religious advertising in its facilities, but discriminates among religious messages on the basis of their content. The majority claims that this content discrimination does not amount to viewpoint discrimination because all religions “are allowed to positively promote their own perspective and even to criticize other positions so long as they do not use demeaning speech in their attacks.” Maj. op. at 91. This conclusion assumes that a statement like “all good Catholics go to heaven” is sufficiently rebutted by replying “all good Buddhists go to heaven.” From this dialogue, we could draw the heartwarming conclusion that “all good Catholics and Buddhists” go to heaven. Good or bad, however, this is simply not the type of message that most religions espouse. Especially for small groups like Ridley’s, an essential part of proselytizing is explaining that in their view and the view of their prophet, “all good Catholics, Buddhists, etc. are not going to heaven; rather, they are going to hell.” This belief is central to their message of conversion. It is the clearest statement of the (eternal) consequences for those who do not convert, and it is undoubtedly a fact that they are hoping will propel the message’s viewers to go to their website and learn more about their beliefs.
Further, while the majority concludes that an advertisement may criticize other religions as long as it does so in a non-demeaning way, it is apparent from the rejection of Ridley’s third advertisement that even a text-based criticism about religion [4] will be more likely to strike MBTA authorities as “hostile,” “mocking,” or “demeaning,” simply because it names that religion. Indeed, the third advertisement did not say anything that was not implicit in the second advertisement, which declared that there were over 1,000 (unnamed) false religions. If the guidelines permit the second advertisement, they cannot reasonably be applied to forbid the third.[5] Thus, the MBTA’s position is intrinsically viewpoint oriented.
The religious nature of Ridley’s advertisement increases the MBTA’s burden, for religious advertising is a “form of religious activity [that] occupies the same high estate under the First Amendment as do worship in the churches and preaching from the pulpits.” Murdock v. Pennsylvania, 319 U.S. 105, 109, 63 S.Ct. 870, 87 L.Ed. 1292 (1943); see also Jews for Jesus, Inc. v. Mass. Bay Transp. Auth., 984 F.2d 1319, 1324 (1st Cir.1993) (prohibiting ban on religious leafletting at MBTA stations). “The principle that government may not enact laws that suppress religious belief or practice [merely because it is unorthodox] is so well understood that few violations are recorded in our opinions.” Church of the Lukumi Babalu Aye, Inc. v. City of *100 Hialeah, 508 U.S. 520, 523, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993) (striking down attempted suppression of religious rites that included animal sacrifices).
Simply put, the First Amendment does not recognize state authority to regulate religious expression merely because it might offend other persons. “It is firmly settled that ... the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers.” Hustler Magazine v. Falwell, 485 U.S. 46, 56, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988) (quoting Street v. New York, 394 U.S. 576, 592, 89 S.Ct. 1354, 22 L.Ed.2d 572 (1969)). Religious speech — especially that of a proselytizing nature most often found in mass advertising by religious organizations — is intended to strike at the core of people’s strongest beliefs; in that sense, it is inevitably “hostile” to those beliefs. Placing the government in a position of deciding whether to allow the expression of those beliefs depending on whether they are “hostile” or “demeaning” to the community strikes at the heart of the First Amendment’s prohibitions against state regulation of speech. Texas v. Johnson, 491 U.S. 397, 414, 109 5.Ct. 2533, 105 L.Ed.2d 342 (1989) (“If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable.”)! Any religious speech will be viewed as “hostile” by at least some, if not all, of those who do not share the belief it proclaims. See Gitlow v. New York, 268 U.S. 652, 673, 45 S.Ct. 625, 69 L.Ed. 1138 (Holmes, J., dissenting) (“Every idea is an incitement.”).
Religious belief is quintessentially a matter of viewpoint. The government cannot allow dissemination of one viewpoint that it finds inoffensive or bland, and prohibit the dissemination of another viewpoint that it finds offensive or “demeaning,” because the “point of all speech protection ... is to shield just those choices of content that in someone’s eyes are misguided, or even hurtful.” Hurley v. Irish-Am. Gay, Lesbian, and Bisexual Group, 515 U.S. 557, 574, 115 S.Ct. 2338, 132 L.Ed.2d 487 (1995). Such distinctions are viewpoint based, not merely reasonable content restrictions.
By its very nature, a prohibition against ads that are “hostile” to an individual or a group of individuals is viewpoint based. The guideline would permit ads from Catholics,. Pentecostals, Jehovah’s Witnesses, Muslims and others stating their beliefs— their “viewpoints” — that their religions were “set up” by God.[6] The MBTA, howev *101 er, refuses to permit Ridley to state the opposite viewpoint: her belief that these religions were not “set up” by God, but are “false,” and that only her belief is correct. This is unquestionably viewpoint discrimination, as “[t]he essence of viewpoint-based discrimination is the state’s decision to pick and choose among similarly situated speakers in order to advance or suppress a particular ideology or outlook.” Berner v. Delahanty, 129 F.3d 20, 28 (1st Cir.1997).
The MBTA’s justification for censoring Ridley’s religious expressions in the third advertisement is the suggestion that some riders might take offense to its content. This is not a sufficient reason to stifle speech protected by the First Amendment. See Planned Parenthood Ass’n/Chicago Area v. Chicago Transit Auth., 767 F.2d 1225, 1230 (7th Cir.1985) (“We question whether a regulation of speech that has as its touchstone a government official’s subjective view that the speech is ‘controversial’ could ever pass constitutional muster.”); see also Penthouse Int’l, Ltd. v. Koch, 599 F.Supp. 1338, 1349-50 (S.D.N.Y.1984) (poster cannot be prohibited in subway stations because its content is offensive to some). What the MBTA fails to understand is that “[zjealots have First Amendment rights too.” Pinette v. Capitol Square Review and Advisory Bd., 30 F.3d 675, 680 (6th Cir.1994), aff'd on other grounds, 515 U.S. 753, 760, 115 S.Ct. 2440, 132 L.Ed.2d.650 (1995). I invite the majority to take note of that principle and conclude, as I do, that the MBTA engaged in viewpoint discrimination in refusing Ridley’s third submission.
II. Forum analysis
Although I find it unnecessary and ill-advised to engage in forum analysis in these cases, it is appropriate that I comment on the majority’s conclusions that the MBTA has not created a designated public forum by opening its facilities to advertisers expressing a broad range of commercial and non-commercial views. Like the Second and Third Circuits, I find that this kind of advertising program on public transportation facilities converts them into a designated public forum. See N.Y. Magazine v. Metro. Transp. Auth., 136 F.3d 123, 129-30 (2d Cir.1998) (concluding that advertising space on outside of city buses was a designated public forum); Christ’s Bride Ministries, Inc. v. S.E. Pa. Transp. Auth., 148 F.3d 242, 252-55 (3d Cir.1998) (finding that transportation authority had created a designated public forum by accepting a variety of advertisements, despite its rejection of a few such advertisements based on their content), cert. denied, 525 U.S. 1068, 119 S.Ct. 797, 142 L.Ed.2d 659 (1999); see also AIDS Action Committee v. MBTA, 849 F.Supp. 79, 83 (D.Mass.1994) (finding that MBTA’s advertising space in subway and trolley cars is a public forum), aff'd on other grounds, 42 F.3d 1 (1st Cir.1994).
A designated public forum may be “created by government designation of a place or channel of communication for use by the public at large for assembly and speech, for use by certain speakers, or for the *102 discussion of certain subjects.” Cornelius, 473 U.S. at 802, 105 S.Ct. 3439 (citing Perry, 460 U.S. at 45, 46 n. 7, 103 S.Ct. 948). Even if the government was not obligated to open the designated public forum or to retain its open character indefinitely, as long as the forum is generally open “it is bound by the same standards as apply in a traditional public forum.” Perry, 460 U.S. at 46, 103 S.Ct. 948.
As discussed by the majority, the key inquiry is whether the MBTA intended to designate its advertising space as a public forum, a question we must answer by considering (1) the MBTA’s policy and practice regarding its advertising space, and (2) the nature of the MBTA’s advertising space and its compatibility with expressive activity. Cornelius, 473 U.S. at 802, 105 S.Ct. 3439.
A. The MBTA’s Policy and Practice
For the government’s policy and practice to create a designated public forum, “the government must intend to make the property ‘generally available’ to a class of speakers.” Ark. Educ. Television Comm’n v. Forbes (“AETC”), 523 U.S. 666, 678, 118 S.Ct. 1633, 140 L.Ed.2d 875 (1998) (quoting Widmar v. Vincent, 454 U.S. 263, 264, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981)). Change the Climate asserts[7] that the MBTA’s policy and practice have made its advertising space generally available to commercial and non-profit organizations for the expression of views by anyone willing to pay its advertising fees. The MBTA does not dispute that any commercial or non-commercial advertiser may submit advertisements under its policy, and that it has intentionally facilitated access for all non-profit organizations by offering them a half-price discount on the fees charged to commercial advertisers.
As a preliminary matter, it is appropriate to state that the fact that the MBTA has chosen to include in its guidelines an assertion to the effect that it “intends that its facilities constitute nonpublic forums” should not be determinative of that issue. Otherwise, such a self-serving approach would allow the government to simply declare property a non-public forum whenever conflicts of this sort arose. See Int’l Soc. for Krishna Consciousness v. Lee, 505 U.S. 672, 695 (1992) (Kennedy, J., concurring). Similarly, the fact that a particular category of speech, such as that regarding tobacco sales, is excluded from a forum does not preclude the designation of a public forum. New York Magazine, 136 F.3d at 129-30 (“[I]t cannot be true that if the government excludes any category of speech from a forum ... that forum becomes ipso facto a non-public forum.”). Nor does the fact that the MBTA charges a fee for the use of its advertising space preclude the creation of a designated public forum, because “[djespite the existence of a fee, the [government] may nevertheless have allowed indiscriminate use” of the forum by “anyone willing to pay.” Air Line Pilots Ass’n, Int’l v. Dep’t of Aviation of the City of Chicago, 45 F.3d 1144, 1155 (7th Cir.1995).
Furthermore, I believe it is worthwhile to consider the situation today within the context of the MBTA’s advertising policies in the years leading up to the events at issue in this litigation. I begin by noting that in 1994, in AIDS Action, we found that the advertising policy promulgated by the MBTA was “scarcely coherent, [and] invite[d] the very discrimination that occurred in [that] case, and was properly enjoined.” 42 F.3d at 12. In the period between AIDS Action and the present liti *103 gation, from 1995 to at least 1999, the MBTA required that:
[a]ll advertisements at any time inserted or placed by the Contractor in or upon any locations or display devices shall be of a reputable character, and the appearance of all advertisements shall be acceptable to and in accordance with the [MBTA’s] Standards for Character and Appearance of Advertisements. No libelous, slanderous, or obscene advertisements, may be accepted by the Contractor for display in or upon the Authority’s transit facilities. Advertisements shall be submitted in advance to the Authority for review at the Authority’s request or whenever the Contractor reasonably believes such advertisements may be objectionable within the meaning of this Article.
This policy was supplemented by an April 21, 1995 letter from the MBTA Interim General Manager, Robert Mabardy, which contained additional guidelines:
The MBTA will refuse any advertisement that is indecent to child viewers, or is of a nature to frighten children, either emotionally or physically.
These guidelines shall not be deemed to prohibit indecent or frightening language that could be considered double entendre, provided that, if a child asked an adult the meaning of such indecent or frightful language, the adult could give a reasonable and truthful answer without reference to indecent or frightening activities or language.
In 1999, the MBTA formulated new bid specifications for transit advertising, which contained a new version of the advertising policy. The 1999 bid specifications prohibited the display of advertisements for tobacco products and echoed the 1992 bid specifications, with the following provisions added:
The MBTA will not accept advertisements containing violent criminal content, firearms, profane content, promotional materials that is harmful to juveniles, and advertisements that denigrate groups based on gender, religion, race, ethnic or political affiliation.
Subsequently, the MBTA went through two more revisions of its guidelines, as described in the majority opinion. A new set of “Interim Guidelines Regulating MBTA Advertising,” promulgated on April 12, 2002, provided that the MBTA “shall not display or maintain any advertisement” that is:
Demeaning or disparaging. The advertisement contains material that demeans or disparages an individual or group of individuals on the basis of race, color, religion, national origin, ancestry, gender, age, disability, ethnicity, or sexual orientation.
On January 17, 2003, the MBTA issued yet another revision of its guidelines, removing the language concerning race, color, etc., and adding the “prevailing community standards” metric for determining whether material is demeaning or disparaging.
As a general rule, “the more restrictive the criteria for admission and the more administrative control over access, the less likely a forum will be deemed public.” Hopper v. City of Pasco, 241 F.3d 1067, 1078 (9th Cir.2001). Over the years, the MBTA’s criteria for admission have been confusing at best, and it has always left the initial determinations of whether advertisements may run afoul of the advertising policy to the subjective evaluation of a private contractor. Those advertisements sent to the MBTA for review have received a similarly subjective evaluation from MBTA employees. Thus, the subjective standards in these policies create a potential for abuse, specifically the poten *104 tial for viewpoint discrimination. See Hopper, 241 F.3d at 1079 (“The potential for abuse of such unbounded discretion is heightened by the inherently subjective nature of the standard itself.”).
I emphasize that
[t]he government may not ‘create’ a policy to implement its newly-discovered desire to suppress a particular message. Neither may the government invoke an otherwise unenforced policy to justify that suppression. Therefore, the government’s stated policy, without more, is not dispositive with respect to the government’s intent in a given forum.
Air Line Pilots, 45 F.3d at 1153 (citations omitted). In determining whether the MBTA has designated its advertising space as a public forum, then, one cannot rely on recent attempts by the MBTA to revise its advertising policy during the course of this litigation to indicate its prior intent on the nature of its advertising space as a forum.
Similarly, the MBTA’s written policies cannot be considered without reference to their application in the years preceding this action. In determining whether the government has designated property to be a public forum, we have previously stated that “actual practice speaks louder than words.” Grace Bible Fellowship, Inc. v. Maine Sch. Admin. Dist. No. 5, 941 F.2d 45, 47 (1st Cir.1991). “[Consistency in application is the hallmark of any policy designed to preserve the non-public status of a forum. A policy purporting to keep a forum closed (or open to expression only on certain subjects) is no policy at all for purposes of public forum analysis if, in practice, it is not enforced or if exceptions are haphazardly permitted.” Hopper, 241 F.3d at 1076. In AIDS Action, we admonished the MBTA that if it were to be allowed to restrict speech, “it will, at the least, need to act according to neutral standards, and it will need to apply these standards in such a way that there is no appearance that ‘the [government] is seeking to handicap the expression of particular ideas.’” 42 F.3d at 13 (quoting R.AV., 505 U.S. at 394, 112 S.Ct. 2538). In practice, the MBTA has not restricted access to its advertising space in a manner sufficient to indicate an intent to maintain it as a non-public or limited public forum.
When we decided AIDS Action, we found that “despite the MBTA’s attempts to present itself as a vigilant gatekeeper, the only ads other than the 1993 [AIDS awareness] ads that we know the MBTA recently rejected are certain Calvin Klein ads which somehow might have been misconstrued as endorsing the Ku Klux Klan, and an animal rights advertisement featuring a photograph of a maimed dog.” Id. at 9. In reviewing the MBTA’s application of its advertising policies since AIDS Action, I find that little has changed. During the five years preceding Change the Climate’s first interactions with PTD, between 1995 and 1999, the MBTA refused to post only fifteen advertisements. Examples include an advertisement for the movie Psycho, which featured an image of a nude woman in a shower with blood at the bottom, rejected because it was “in conflict with the MBTA’s dignity in the workplace and the Commonwealth’s domestic violence programs,” neither of which criteria are set forth in the MBTA’s advertising policy. Rejection of ads also appears to have occurred on an ad hoc, subjective basis. For example, MBTA refused to post an advertisement from the conservation organization Surfriders, aimed at discouraging people from leaving cigarette butts on the beach, apparently because it included images of people smoking. The MBTA posted, however, advertisements for A1 Italia airline that featured a woman holding a cigarette with the caption, “Create a buzz.” *105 Thus, the ad hoc rejection of a handful of ads over the past decade cannot serve as the basis for concluding that MBTA intended its advertising space as a non-public forum.
B. The Nature of the Forum and Its Compatibility with Expression
It is also necessary to examine “the nature of the property and its compatibility with expressive activity to discern the government’s intent.” Cornelius, 473 U.S. at 802, 105 S.Ct. 3439 (citations omitted). This inquiry involves examining “the relationship between the reasons for any restriction on access and the forum’s purpose.” United Food and Commercial Workers Union, Local 1099 v. Southwest Ohio Reg’l Transit Auth., 163 F.3d 341, 351 (6th Cir.1998). The district court in Change the Climate found that “[t]he principal purpose of the MBTA using some of this space for advertising is to earn revenue in support of the MBTA’s goal of providing transportation.” 214 F.Supp.2d 125, 132 (D.Mass.2002). In general, “the courts will infer an intent on the part of the government to create a public forum where the government’s justification for the exclusion of certain expressive conduct is unrelated to the forum’s purpose, even when speakers must obtain permission to use the forum.” United Food, 163 F.3d at 351. Forum analysis must therefore “involve a careful scrutiny of whether the government-imposed restriction on access to public property is truly part of ‘the process of limiting a nonpublic forum to activities compatible with the intended purpose of the property.’ “ Id. at 351-52 (quoting Perry, 460 U.S. at 49, 103 S.Ct. 948). Courts will hold “that the government did not create a public forum only when its standards for inclusion and exclusion are clear and are designed to prevent interference with the forum’s designated purpose.” Id.
The Supreme Court has indicated that “[i]n cases where the principal function of the property would be disrupted by expressive activity, the Court [has been] particularly reluctant to hold that the government intended to designate a public forum.” Cornelius, 473 U.S. at 804, 105 S.Ct. 3439. The MBTA can hardly argue that its advertising space is generally incompatible with expressive activity, or that the MBTA’s principal function of providing transportation would be disrupted by the expressive activity proposed by Change the Climate or Ridley, since it has routinely made its advertising space available to both commercial and public-issue advertising on a wide range of issues without any disruption. See, e.g., Planned Parenthood, 767 F.2d at 1232 (“[S]ince CTA already permits its facilities to be used for public-issue and political advertising, it cannot argue that such use is incompatible with the primary use of the facilities.”). It is clear that the MBTA “created a forum that is suitable for the speech in question.... ” Christ’s Bride, 148 F.3d at 252.
The majority wrongly emphasizes the MBTA’s proprietary role with regard to its advertising space. In an early case addressing advertising on public transit systems, the Supreme Court held that because “the city is engaged in commerce,” and “[t]he car card space, although incidental to the provision of public transportation, is a part of the commercial venture,” “a city transit system has discretion to develop and make reasonable choices concerning the type of advertising that may be displayed in its vehicles.” Lehman v. City of Shaker Heights, 418 U.S. 298, 303, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974). Since Lehman, public forum analysis has developed considerably but has continued to find that “[w]here the government is acting as a proprietor, managing *106 its internal operations, rather than acting as lawmaker with the power to regulate or license, its action will not be subjected to the heightened review to which its actions as a lawmaker may be subject.” Lee, 505 U.S. at 678, 112 S.Ct. 2701. The district court’s finding that “[t]he principal purpose of the MBTA using some of this space for advertising is to earn revenue in support of the MBTA’s goal of providing transportation,” Change the Climate, 214 F.Supp.2d at 132, would suggest that the MBTA is acting as a proprietor. In Lee, however, it was “the commercial and restricted nature of an airport concourse which suggested that the government did not intend the concourse to be primarily a forum for expression.” Christ’s Bride, 148 F.3d at 250 (“We do not read Lee ... to mean that every time the government runs a commercial enterprise it has, by definition, decided not to create an open forum.”). While the primary purpose of the MBTA’s advertising space may be to generate revenue, it is clear that the MBTA’s policy of allowing and, in fact, encouraging non-commercial advertising (by offering a discount) demonstrates its judgment that such advertising does not conflict with its proprietary interests. Air Line Pilots, 45 F.3d at 1157 (finding no “indication that permitting public interest groups to advertise would threaten the vitality of the City’s commercial interests in deriving revenue from the advertising displays.”). Having opened its advertising space for non-commercial discourse, the MBTA now wishes to act as a lawmaker, and not as a proprietor, in attempting to regulate the content of that discourse, which indicates that it has designated its advertising space a public forum. New York Magazine, 136 F.3d at 129 (“Where the government acted for the purpose of benefitting the public, ... the Court has found a public forum.”).
In some contexts, however, limiting advertising space has been found consistent with a proprietary purpose. In Uptown Pawn & Jewelry, Inc. v. City of Hollywood, 337 F.3d 1275, 1279 (11th Cir.2003), discussed by the majority, Maj. op. at 80, the Eleventh Circuit concluded that the City’s prohibition on pawn shop advertising on park benches “evidences an intent, not to create a public forum, but to act in a proprietary capacity to manage a commercial venture.” Id. at 1281. Here, however, there is no evidence that posting Change the Climate’s or Ridley’s advertisements would have any adverse effect on the MBTA’s ability to generate revenue through its advertising space, regardless of whether their messages are controversial. As previously described, the MBTA has posted a range of commercial and public-issue advertising that would undermine any argument that advertisements like those now proposed could be excluded in the interests of protecting the revenue-generating capacity of its advertising space. Here, then, “the purpose of the forum does not suggest that it is closed, and the breadth of permitted speech points in the opposite direction.” Christ’s Bride, 148 F.3d at 253.
Moreover, the Supreme Court has considered the government’s practice of excluding speech from a forum “not because the exclusion of categories of speech creates a non-public forum, but because the nature of the excluded categories sheds light on whether the government was acting as a proprietor or a regulator.” New York Magazine, 136 F.3d at 130; Cornelius, 473 U.S. at 805, 105 S.Ct. 3439 (“The decision of the [government to limit access to the [forum] is not dispositive in itself; instead, it is relevant for what it suggests about the [g]overnment’s intent in creating the forum.”). In Lehman, the Court found that the 26-year, consistently enforced ban on non-commercial advertising was consistent with the government’s role as a pro *107 prietor, because “[r]evenue earned from long-term commercial advertising could be jeopardized by a requirement that short-term candidacy or issue-oriented advertisements be displayed.” 418 U.S. at 304, 94 S.Ct. 2714. Other courts have followed Lehman to hold that a total ban on noncommercial speech may be consistent with the government acting in a proprietary capacity and have found transportation advertising spaces to be non-public fora when the government “consistently promulgates and enforces policies restricting advertising ... to commercial advertising.” Children of the Rosary v. City of Phoenix, 154 F.3d 972, 978 (9th Cir.1998); Lebron v. Nat’l R.R. Passenger Corp. (Amtrak), 69 F.3d 650, 656 (2d Cir.1995). When the advertising space has been opened to noncommercial speech, however, courts have distinguished the advertising space in question from the total ban on non-commercial speech present in Lehman.
Disallowing political speech, and allowing commercial speech only, indicates that making money is the main goal. Allowing political speech, conversely, evidences a general intent to open a space for discourse, and a deliberate acceptance of the possibility of clashes of opinion and controversy that the Court in Lehman recognized as inconsistent with sound commercial practice.
New York Magazine, 136 F.3d at 130; Lebron v. Washington Metro. Area Transit Auth., 749 F.2d 893, 896 (D.C.Cir.1984)(“There is no ... question that WMATA has converted its subway stations into public fora by accepting ... political advertising.”). The MBTA has no longstanding policy of prohibiting public-issue advertisements like Change the Climate’s or Ridley’s. While excluding political campaign speech from its advertising space, the MBTA has allowed and intentionally encouraged non-commercial advertising, including public-issue advertising regarding social issues like drugs, crime, violence, abortion, AIDS, suicide, and religion.
The provisions of the MBTA’s Revised Interim Guidelines under which it refused to post Change the Climate’s advertisements also indicate that it is acting as a regulator/lawmaker and not as a proprietor. The guidelines prohibit the posting of any advertisement that “promotes or encourages, or appears to promote or encourage, the use or possession of unlawful or illegal goods or services,” or unlawful conduct. The MBTA has not offered any commercial justification for its interest in prohibiting advertisements containing such material, and we see “no commercial reason why [the MBTA] has any special interest in [preventing unlawful conduct]; [the MBTA’s] interest is only the interest in upholding the law because it is the law.” New York Magazine, 136 F.3d at 130. This is certainly a regulatory and not a proprietary interest.
Other courts have similarly found the advertising spaces of various urban transportation systems to be a designated public forum when the government has allowed “a wide variety of commercial, public-service, public-issue, and political ads,” Planned Parenthood, 767 F.2d at 1232, “political and other non-commercial advertising generally,” New York Magazine, 136 F.3d at 130, or “public-service, public-issue, and political advertisements in addition to traditional commercial advertisements.” United Food, 163 F.3d at 346. In these cases, contrary to the majority’s assertions, the agency’s control over public issue advertising was not unlike that exercised by the MBTA in practice.
In Christ’s Bride, the Southeastern Pennsylvania Transportation Authority (SEPTA) was deemed a designated public forum because, while SEPTA asserted its *108 right to refuse advertising deemed “objectionable for any reason,” SEPTA had the “practice of permitting virtually unlimited access to the forum.” 148 F.3d at 251-52. The Third Circuit found that in practice “SEPTA has exercised control over only three ads, two of which had graphics to which SEPTA objected, and one of which solicited personal injury cases that could be directed against SEPTA.” Id. at 252.
In United Food, the Southwest Regional Transit Authority (SORTA) had rejected an advertisement under a provision of its advertising policy that prohibited “[ajdver-tising of controversial public issues that may adversely affect SORTA’s ability to attract and maintain ridership.” 163 F.3d at 352. The Sixth Circuit concluded that “the lack of definitive standards guiding the application of SORTA’s advertising policy permits SORTA, like SEPTA, to reject a proposed advertisement deemed objectionable for any reason.” 163 F.3d at 354. Under these circumstances, the transportation authorities’ contention that the advertising at issue was incompatible with the nature of the forum created by their advertising spaces could not be sustained. The Sixth Circuit’s reasoning is instructive:
We also find that SORTA’s stated purpose for limiting advertising on buses only tenuously related, at best, to the greater forum’s intended use. This is not a situation like that in Cornelius, where the government established a controlled solicitation process to prevent disruption in the workplace, or [AETC ], where a public broadcasting system logistically could not possibly accommodate all political candidates, or even [Perry ], where a high school had a direct interest in controlling access to its internal mail system. Here there is no established causal link between SORTA’s goal of enhancing the environment for its riders, enhancing SORTA’s standing in the community, and enabling SORTA to attract and maintain its ridership, and its broad-based discretion to exclude advertisements that are too controversial or not aesthetically pleasing. Although political and public-issue speech is often contentious, it does not follow that such speech will necessarily frustrate SORTA’s commercial interests. Rather, it may be the case that only in rare circumstances will the controversial nature of such speech sufficiently interfere with the provision of Metro bus services so as to warrant excluding a political or public-issue advertisement.
United Food, 163 F.3d at 354.
Admittedly, the MBTA has not opened its advertising space to all public-issue advertising except that which it deems “objectionable for any reason,” id., but has instead promulgated written advertising policies and exercised control over a handful of advertisements in the five years prior to the events at issue here. Still, the incoherent written policies and the occasional, subjective exercise of control are insufficient to demonstrate an intent by the MBTA to close its advertising space as a public forum when it routinely posts public-issue advertisements on all manner of social issues.
Thus, the MBTA’s policy and practice regarding its advertising space, and the nature of that space as created and managed by the MBTA, demonstrates an intent by the MBTA to create a designated public forum.
Finally, I must note that, while not a sidewalk or city park, the MBTA’s facilities are the modern analogue to these traditional public fora. As mentioned above, 2.5 million people in the Greater Boston area use the MBTA’s facilities, and its 170 bus and trolley routes, 4 subway lines, and 13-branch commuter rail network transit *109 at some point of their routes through or across traditional public fora. In addition to the car cards at issue in this case, the MBTA allows advertising on the outside of its vehicles, which are obviously displayed as they transit through the public streets. Some of the cars on some of the subway lines that travel above ground are even painted in such a way that the whole exterior of the car constitutes, in effect, an advertisement. The MBTA also allows advertising on the walls of the numerous bus and trolley shelters that sit on the public sidewalks and can be seen from the public thoroughfare. Thus, in addition to the traveling public, the MBTA’s advertising influence reaches into those on the traditional public fora — the streets and sidewalks of Greater Boston. As stated above, this means that the MBTA is in a position to control 40,000 advertising spaces for the dissemination of information to a large segment of the region’s population. It is disquieting, to say the least, that the majority would allow the government to control the content of the information to which the public is exposed through these advertising spaces. The MBTA’s' advertising system is indeed a powerful tool with which to influence public opinion, one which should be opened to the crucible of competing viewpoints to the largest extent possible.
III. Conclusion
Although I concur with the majority’s conclusion that the MBTA engaged in viewpoint discrimination when it rejected Change the Climate’s proposed advertisements, I dissent from its failure to recognize similar discrimination with regard to Ridley’s advertisements. I further dissent from the majority’s decision to engage in forum analysis, and from the outcome thereof.
APPENDIX
[[Image here]]
*110 [[Image here]]
[[Image here]]

. Indeed, the majority’s insistence on delving into forum analysis is perplexing, given its recognition that "[p]ublic forum analysis itself has been criticized as unhelpful in many contexts, and particularly this one where the government is operating a commercial enterprise earning income from advertising.” Maj. op. at 75 (citing Tribe, supra, at § 2-24, at 922 ("[W]hether or not a given place is deemed a ’public forum’ is ordinarily less significant than the nature of the speech restriction— despite the Court's rhetoric."); Frederick Schauer, Principles, Institutions, and the First Amendment, 112 Harv. L.Rev. 84, 97 (1998) ("Of all of the paths down which the Court might go in dealing with the government enterprise cases, the so-called 'forum doctrine' appears least satisfactory.”)).

. In this way, Ridley’s advertisement would be analogous to a public service announcement stating: “Kids who smoke think they look cool, but really it makes them look stupid.’’ It would be difficult to imagine the MBTA rejecting such an advertisement on the basis that it ridicules or demeans adolescent smokers.

. The majority's suggestion, Maj. op. at 93-95, that the vagueness inquiry is not important in this case because it does not involve a licensing scheme in a traditional public forum is unconvincing. Even if the majority is correct that this is not a traditional public forum in the legal sense, the MBTA transit system serves as its functional equivalent in today’s society. 2.5 million people use its facilities on a daily basis, and it contains approximately 40,000 advertising spaces. In effect, the MBTA is in a position to control the dissemination of information to a large segment of the public which, in a practical sense, is obliged to be exposed to whatever advertising the MBTA chooses to permit in its facilities. Consequently, the "danger of excessive discretion ... lead[ing] to viewpoint-discriminatory decisions,” id. at 94, is quite serious. Further, while the majority indicates that concern about vagueness is at its zenith in licensing schemes for traditional public fora, I am aware of no precedent that would permit *99 vagueness in regulations outside of this context, especially when the potential ramifications of unconstitutional implementation have a similar practical effect.

. The rejected advertisement stated that "[t]here are no scriptures in the Bible that teach that God set up the Catholic religion, the Baptist religion, the Pentecostal religion, the Jehovah's Witness religion or the Muslim religion. These religions are false.”

. The majority insists that MBTA ought not be bound to permit expressions analogous to those it mistakenly permitted in the past. This might be so in an isolated case. However, one cannot ignore the MBTA's haphazard and unpredictable pattern of enforcement with regard not only to Ridley's three ads, but also to earlier ads, such as those at issue in AIDS Action, 42 F.3d at 1. This suggests that it was no mere oversight or misunderstanding that led to the acceptance of Ridley’s second advertisement. We must not allow the MBTA to change its standards or its enforcement thereof every time its application of the guidelines is challenged.

. Claims of a unique holy charter and exclusive salvation are commonplace in western religion. The examples below are not dissimilar from the position espoused by Ridley in her third advertisement:
The Roman Catholic Church: "This is the sole Church of Christ, which in the Creed we ' profess to be one, holy, catholic and apostolic.” Catechism of the Catholic Church # 811. "There is but one holy Catholic and apostolic church, outside of which there is no salvation ... it is altogether necessary for salvation for every creature to be subject to the Roman Pontiff.” 1 Vatican Council II 364-65 (Austin Flannery, O.P., ed.).
Jehovah's Witnesses: “Consider too, the fact that Jehovah’s organization alone, in all the earth, is directed by God's holy spirit or active force.” The Watchtower, July 1, ,1973, at 402.
Church of Jesus Christ of Latter-day Saints (Mormon): "This is not just another Church. This is ; not just one family of Christian churches. This is the Church and the kingdom of God, the only true Church upon the face of the earth, according to the Lord’s own words.” Ezra Taft Benson, The Teaching of Ezra Taft Benson 164-5 (1988). "Behold there are save two churches only; the one is the Church of the Lamb of God and the other is the churches of the devil; wherefore who so belongeth not to the church of the lamb of god belongeth to that great church; which is the mother of abominations; and she is the *101 whore of all the earth”. Book of Mormon, 1 Nephi 14:10.
Islam: "If anyone desires a religion other than Islam (submission to Allah) never will It be accepted of Him.” Qur’aan, Soorah Aal'im-raan 3:85.
Indeed, the MBTA guideline would prohibit even expression of the First Commandment, which admonishes believers: "Thou shalt have no other gods before me.” Exodus 20:3. This mandate would have to be rejected as offensive to non-Judeo-Christians because it is "hostile” to and “disparages” believers in deities other than the Judeo-Christian god.

. I again note that Ridley has never argued forum analysis. Such discussion is irrelevant to Ridley's viewpoint and vagueness arguments, with which I fully agree.